Louis M. Barbone, Esquire (N.J. Attorney ID# 014891986)
JACOBS & BARBONE, P.A.
A Professional Corporation
Attorneys at Law
1125 Pacific Avenue
Atlantic City, New Jersey 08401
(609) 348-1125
Attorneys for Defendant
lbarbone@jacobsbarbone.law

Stacy A. Biancamano, Esq.
Biancamano Law, LLC
312 North Avenue E, Suite 7
Cranford, NJ 07016
(908)325-3023
sbiancamano@biancamanolaw.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff | Criminal No. 18-608 (RMB) |
| v. | |
| STERLING WHEATON | DEFENDANT WHEATEN'S BRIEF IN OPPOSITION TO THE GOVERNMENT'S *IN LIMINE* MOTION TO EXCLUDE THE DEFENSE EXPERT |
| Defendant | |

The Government moves *in limine* to exclude the testimony of Dr. David Ferland as

defendant's expert witness on canine deployment.   The defense served Dr. Ferlan's

expert report April 2, 2020 and the Government's motion to exclude was filed September

29, 2021.

According to the Government, Dr. Ferland must be barred from testifying because

his opinion "that Wheaten acted reasonably is a legal conclusion that Courts have

routinely barred and because the jury does not need help to determine what happened".

(Government's brief, p3).   The Government maintains that (1) the core of Dr. Ferland's

proposed testimony is his conclusion that Wheaten acted reasonably and that is an ultimate legal conclusion; (2) that Dr. Ferland's version of the events is a "one-sided defense-oriented interpretation of video, witness interviews and grand jury testimony" (Government's brief, p6); and (3) that Dr. Ferland's testimony with regard to Wheaten's state of mind is inadmissible (Government's brief, p7).

Defendant opposes the motion and maintains that the opinions and testimony of Dr. Ferland on the proper deployment of a canine pursuant to the canine policies and regulations controlling defendant Wheaten are highly relevant, admissible and necessary in understanding the mandatory rules, regulations and policies governing and authorizing the defendant's deployment of a canine. Notwithstanding the Government's argument, Dr. Ferland is intended to provide specialized knowledge and experience applicable to the defendant's training and strict compliance with the Police Department's Canine Policies and Procedures as well as the New Jersey Attorney General's Use of Force policy regarding canines.

FACTUAL BACKGROUND

**A.    The Indictment Identifies the Existence and Importance of Canine Training and the Rules Applicable to a Canine Handler.**

Defendant is charged in Count One of the Indictment with a violation of 18 U.S.C. §242, the deprivation of civil rights under color of law. (Exhibit A). The Indictment recounts the fact that the defendant was a duly appointed police officer in the City of Atlantic City and that the defendant was authorized to make lawful arrests. (Count One, ¶1a). The Indictment next identifies the defendant as a selected canine officer trained at the John "Sonny" Burke Police Canine Academy in the area of canine patrol, scent detection as

2

well as "all aspects of patrol dog/handler team instruction".  Notably, the subject matter included "criminal apprehension".  (Count One, ¶1b).

The Indictment further avers that defendant graduated the Canine Academy with a "certified patrol canine".  (Count One, ¶1c).  Further, that the canine, "Hagan", was assigned to defendant Wheaten and that Wheaten was patrolling the City on June 15, 2013 as a canine handler.

The Indictment thereafter generally sets forth the same factual version contained in Dr. Ferland's report.  Specifically that on June 15, 2013 several Atlantic City officers told "victim #1" to leave the area of Tropicana and he walked across the street, "yelling threats and obscenities at the police officers".  (Count One, ¶3).  After several minutes, ACPD Officer 1 decided to arrest "victim 1" and that officer and others struggled with the victim taking him to the ground.  (Ibid, Count One, ¶5).  During the struggle four other police officers delivered escalating force to victim 1 including "strikes ..., punches ..., baton strikes and knee strikes".  (Count One, ¶6).

In the course of that struggle, over the course of two minutes, those on-scene police officers requested via police radio the assistance of a canine officer.  Defendant Wheaten and Hagan responded.  (Count One, ¶7).  Wheaten deployed the canine and according to the Government, it was "without issuing a warning that he would deploy the dog or allowing victim #1 the chance to surrender".  (Count One, ¶10).  The Indictment likewise focuses upon the defendant's "training at the Canine Academy", where according to the Government defendant Wheaten was trained with regard to the type of canine apprehension that has historically resulted in death.  According to the Indictment, the canine bit the chest of victim 1, victim 1 then pushed the canine off his chest and rolled

3

onto his side and the canine then reengaged victim #1 and bit him on the back of the neck. The government avers that defendant "did not immediately remove Canine Hagan from the back of victim #1's neck but instead told Canine Hagan to "hold". (Count One, ¶11).

The Indictment therefore specifically details those allegations of the Government that are alleged to be violations by the defendant of the canine Rules & Regulations that Wheaten was taught at the Academy and which Wheaten was required to follow pursuant to Department law and Attorney General guidelines. The Indictment alleges that factual predicate as evidence of Wheaten's purported state of mind and willfulness to violate the civil rights of victim #1.

**B.    The Ferland Report and the Applicable Local and State Rules and Regulations Governing Canine Deployment.**

The expert report of Dr. David Ferland reviews and addresses the "deployment of the [defendant's] canine". (Ferland report, Exhibit A to the Government's brief, p2). Dr. Ferland identifies 28 items of discovery analyzed and reviewed. Included are items 15 and 16, specifically:

> Canine policies and procedures as of 3-20-12;
> Canine policies and procedures as of 7-17-17.

(Ferland report, Exhibit A to the Government's brief, p2).

In the context of his review, findings and opinions, Dr. Ferland focuses upon canine deployments, and specifically the rules, policies and procedures mandated by the Atlantic City Police Department as well as the New Jersey Attorney General in utilizing a canine. His focus is in large part fixed upon the rules and regulations within the policies and procedures governing the canine handler and then application of those policies and

procedures to the specific conduct of defendant Wheaten on June 15, 2013.  His analysis with regard to canine policies and procedures, separate and apart from the ultimate issue of whether force utilized was reasonable, is specifically detailed in four particular paragraphs of his report as follows:

1. Officer Wheaten acted professionally, **according to established canine deployments**, and within objective/reasonable standards given the totality of circumstances.  (Page 4, ¶1).

3. **A canine warning was not required according to existing standards, practice, case law and policy**.  In fact there is nothing reviewed that would suggest otherwise other than personal opinions.  **The ACPD policy in effect at the time did not require these use warnings on incidents other than searches**.  A canine trainer also acknowledged that in about 1% of canine deployments, canine use announcements would not be expected or given.  (Page 5, ¶3).

5. Officer Wheaten was not given time in which to deliver any warning.  Some facts involved but not limited to include that five (5) officers could not control or restrain Castellani upon Wheaten's arrival; upon rounding the blindside corner of his cruiser, Wheaten hears threats that Castellani was reaching for a weapon; Wheaten did not see Castellani's right hand which was hidden under his body**; and Wheaten immediately and correctly deployed the canine as a mechanical force to inflict pain compliance upon Castellani**.  Wheaten properly warned officers of impending canine deployment for their safety and correctly targeted the canine onto the rib area or the area where Castellani was hiding his right hand and where a weapon was believed to have been.

7. There was testimony about the use of force continuum, warnings, red zones and so on.  It should be noted that the canine is unlikely to inflict death and that there are only two examples of when a police canine has been involved in the death of a human.  The use of force continuum need not be followed in succession or progression.  For example, while oleoresin capsicum (OC) spray is on the continuum before deadly force, an officer need not go through all the use of force continuum steps before deadly force might be justified ... (Page 7,¶14).

8. Dr. Mesloh, head trainer Joe Rodriguez and dog trainer Dennis McSweeney all agreed that the team was **properly trained**.  There was violence involved caused by Castellani that supported the use

of the canine.  Trainer Dennis McSweeney specifically writes that he supported Wheaten (a highly trained and experienced officer) use of the canine **and found it to be within training, policies, and law**. (Page 8, ¶15).

The above particular parts of the Ferland report speak directly to the allegations of fact within the indictment and constitute a review and application of Wheaten's conduct to the canine policies and procedures that were the law, binding upon Wheaten at the time of this deployment.

The Atlantic City Police Canine Policies and Procedures (Exhibit B) is the local law governing defendant Wheaten's performance of duty as a canine handler.  Defendant Wheaten is duty-bound to know the governing policies and procedures, and to act in conformance with the rules and regulations outlined in the policy.  The policy identifies the controlling standards on the use of force in §B and C as follows:

B.    In situations where K-9 officers are justified in using force, the utmost restraint should be exercised.  The use of force should never be considered routine.  In determining to use force, the K-9 officer shall be guided by the principle that the degree of force employed in any situation should be only that which is reasonably necessary.

C.    K-9 officers should use only that amount of force that he or she reasonably believes is immediately necessary.  K-9 officers should exhaust all other reasonable means before resorting to the use of force.  It is the policy of the State of New Jersey that a K-9 officer will only use that force which is objectively reasonable and necessary.

(Exhibit B, p6).

The ACPD K-9 policy then specifically addresses when a canine may be deployed on a suspect, as follows:

L.    A canine officer may use physical force or mechanical (K-9) force when they reasonably believe it is immediately necessary at the time to:

1.    Overcome resistance directed at the officer or others; or

6

2. Protect the officer or third party, from unlawful force; or
3. Protect property; or
4. Effect other lawful objectives, such as to make an arrest.

(Exhibit B, p6).

The policy further identifies four factors that must be considered prior to deployment of the canine:

M. Four factors for deployment.

1. Where use of mechanical force is justified to effect the arrest of a suspect and probable cause exists to believe that the suspect has committed an offense as defined in N.J.S.A. 2C:1-14, the canine may be directly used to apprehend the suspect.

2. **Taking into consideration the totality of the circumstances**, using the information available to the officer(s) at the time of the incident, the K-9 officer shall consider the following factors in determining whether to use a police dog to forcibly effect an apprehension:

   a. The severity of the crime under investigation; and
   b. Whether the suspect poses an immediate threat to the safety of police or others nearby; and
   c. Whether the suspect is actively resisting arrest with force or violence; and
   d. Whether the suspect has attempted to evade arrest by flight.

(Exhibit B, p7).

Further, the policy directly addresses the issue of whether a K-9 officer must given an audible announcement to the suspect prior to deployment:

4. Unless it would otherwise increase the risk of injury or escape, if possible, a clearly audible warning announcement that a police K-9 will be utilized shall become (sic) prior to utilizing the K-9.

(Exhibit B, p7, §m, ¶4).

Likewise, the policy addresses whether an apprehension suspect must be given the opportunity to surrender:

E.    Criminal Suspect Apprehension:

*   *   *

3.    Whenever possible, the K-9 officer shall give the suspect the opportunity to surrender by delivering a loud and clear audible warning prior to the release of the canine to make the apprehension.

4.    The warning announcement shall be as follows:

"This is the police.  You are under arrest.  Stop or I will release my police dog who will bite you".

Within the same "Criminal Suspect Apprehension" section, the policy addresses when a canine officer is to order the dog to release the suspect.  First, if the "suspect surrenders" (Exhibit B, §E, ¶6m, p14); (2) where apprehension is made and the suspect complies and "submits to the arrest", the canine officer must immediately command release. (Ibid.).  If however, apprehension is made and the suspect "offers resistance", once the suspect complies and "submits to the arrest", the "canine officer shall immediately command the canine to release the suspect and call the canine into a watch position". (Ibid., ¶8 and 9).

Finally, the policy speaks directly to the review of a canine officer's use of mechanical force in making a suspect apprehension as follows:

G.    Canine officers, whose actions are consistent with the law and the provisions of our use of force and canine policies, will be strongly supported by the law enforcement community and subsequent review of their conduct regarding the use of force.  (Exhibit B, §V, ¶G, p6).

The City's canine policies are taken directly from the New Jersey Attorney General's Use of Force policy.  Therein, the Attorney General of New Jersey declared that:

> In situations where law enforcement officers are justified in using force, the utmost restraint should be exercised.  The use of force should never be considered routine.  In determining to use force, a law enforcement officer shall be guided by the principle that the degree of force employed in any situation should be only that reasonably necessary.  Law enforcement officers should exhaust all other reasonable means before resorting to the use of force.  It is the policy of the State of New Jersey that law enforcement officers will use only that force which is objectively reasonable and necessary.

(Exhibit C, Attorney General Use of Force Policy, p1).

The Attorney General of New Jersey defines the use of a canine as "mechanical force":

1. Mechanical force involves the use of some device or substance, other than a firearm, to overcome a subject's resistance to the exertion of the law enforcement officer's authority.

2. Examples include the use of a baton or other object, canine physical contact with the subject, or chemical or natural agent spraying.

(Exhibit C, §D, p3).

The Attorney General's policy also authorizes and limits the use of force as follows:

A. Use of Force.

   1. A law enforcement officer may use physical force or mechanical force when the officer reasonably believes it is immediately necessary at the time:

      a. To overcome resistance directed at the officer or others; or
      b. To protect the officer or a third party, from unlawful force; or
      c. To protect property; or

9

        d.      To effect other lawful objectives, such as to make an arrest.

(Exhibit C, §I, p4-5).

## LEGAL ARGUMENT

### POINT I

EXPERT TESTIMONY ON THE DEFENDANT'S COMPLIANCE WITH MANDATED CANINE POLICIES AND PROCEDURES IS HIGHLY RELEVANT AND ADMISSIBLE, AND DOES NOT VIOLATE F.R.E. 704(b).

Pursuant to F.R.E. 704(b):

In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or other defense.  Those matters are for the trier of fact alone.

Indeed, an expert opining on legal conclusions or analysis should be barred when such "testimony involve[s] only [the expert's] views concerning the reasonableness of the officer's conduct in light of "Fourth Amendment standards", because the testimony "is not a fact-based opinion, but a statement of legal conclusion.  The legal conclusions are for the Court to make".  Peterson v. City of Plymouth, 60 F.3d  469, 475 (8th Cir. 1995);  see also United States v,. Williams, 343 F.3d. 423,435 (5th Cir. 2003)("reasonableness under the Fourth Amendment or due process clause is a legal conclusion".)

As such, the Federal Rules of Evidence do not permit the testimony of a police expert rendering an opinion about whether "particular conduct violated the relevant constitutional provisions".  Smith v. New Jersey, 213 W.L. 3658786 (D.N.J. July 11, 2013).

Likewise, expert testimony is not needed on issues that the jury can understand on its own.  For that reason, expert testimony is unnecessary and improper with regard

to the jury's competency to assess a defendant's intent.  Padillas v. Stork-Gameco, Inc.,
186 F.3d 412, 415-16 (3d Cir. 1999).

Defendant Wheaten does not intend to elicit testimony from Dr. Ferland with regard
to either his legal analysis or his legal conclusion on whether Wheaten acted reasonably
or unreasonably in violating 18 U.S.C. §242.  Defendant does intend testimony from Dr.
Ferland on those policies and procedures governing the use and deployment of a canine
in the context of effecting an arrest.  Dr. Ferland is not required, nor will he opine as to
the ultimate standard of constitutional reasonableness.  He will instead do as he did
pursuant to his report, namely review the actual conduct of defendant Wheaten in the
context of those specific rules and regulations that he was required to follow as an Atlantic
City Police officer pursuant to department and State law as itemized in the ACPD Canine
Policies and Procedures.  In that regard, the issue is not whether Wheaten's conduct was
constitutionally unreasonable, it is instead whether pursuant to generally accepted
practices and procedures for law enforcement officers such as Wheaten, he followed the
rules and practices mandated for all canine handlers.

As this Court has had occasion to address previously, the testimony of a police
expert by way of a fact-based opinion about following rules and procedures pursuant to
police science, should not be barred:

> Plaintiff's expert, Mr. Stine, has opined that the use of the baton was
> "excessive force and contrary to generally accepted practices and
> procedures for professional law enforcement officers".  Pl.'s Ex. B at 13.  As
> discussed at oral argument, this Court agrees with defendant that the legal
> conclusions contained in plaintiff's expert report cannot be considered.  See
> Patrick v. Morman, 536 Fed. Appx. 255, 258 (3d Cir. 2013)("Rule 704 …
> prohibits experts from opining about the ultimate legal conclusion or about
> the law or legal standards".)  While the sections in plaintiff's report deeming
> the force applied as "excessive force" must be disregarded, the Court can

consider Stine's statement that Brown's use of the baton was contrary to generally accepted practices and procedures for law enforcement officers."

Fried v. Tetzlaff, 2014 W.L. 1095735 *10 (D.N.J. March 19, 2014).

The testimony of expert Ferland with regard to the rules and regulations required of a canine handler in the context of effecting a lawful arrest and the facts proving defendant Wheaten's compliance with those rules and regulations, is highly relevant, factual evidence for a jury's determination of both the defendant's intent as well as his alleged "willfulness".

## POINT II

THE TESTIMONY OF DR. FERLAND ON CANINE POLICY AND PROCEDURE, THE EXPLANATION OF THOSE POLICIES AND PROCEDURES AS WELL AS THE FACTUAL EVIDENCE IN SUPPORT OF THOSE POLICIES AND PROCEDURES ARE ALL ADMISSIBLE PURSUANT TO F.R.E. 702.

Pursuant to F.R.E. 702:

A witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods, and (d) the expert has reliably applied the principles and methods to the facts of the case.

F.R.E. 702 has been distilled into "a trilogy of restrictions on expert testimony: qualification, reliability and fit". Schneider ex. rel. k. Estate of Schneider v. Fried, 320 F.3d 296, 404 (3d Cir. 2003). Here, the Government does not contest Dr. Ferland's qualifications. In the Third Circuit, that requirement is interpreted liberally and it includes "a broad range of knowledge, skills and training [that] qualify the expert as such". In re Paoli R.R. Yar P.C.B. Litig., 35 F.3d 717, 741 (3d Cir. 1994).

The second element of "reliability" means that expert testimony must be based on "methods and procedures of science" and not on "subjective belief or unsupported speculation" and "proposed testimony must be supported by appropriate validation...". Daubert v. Merrill Dowe Pharmaceuticals, Inc., 509 U.S. 5790, 590, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

The third requirement of "fit":

> ... goes primarily to relevance by demanding a valid scientific connection to the pertinent inquiry as a precondition to admissibility.

Daubert, ibid., at 580.

Here, there cannot be any reasonable debate that the training, requirements and procedures that a canine handler must follow are indeed specialized areas of "knowledge, skill, experience, training or education". An expert's testimony with regard to that area of police science as well as the particular rules and regulations governing the conduct of Wheaten and how the defendant's particular action followed that policy and procedure is highly relevant evidence the defendant is entitled to admit on multiple issues that this jury must consider.

First, and with regard to the Third Circuit's Model Jury Instruction on proof of mental state, the jury is instructed as follows:

> ... Thus, to determine the defendant's state of mind, such as what the defendant intended or knew at a particular time, **you may consider evidence about what the defendant said, did, and failed to do, how the defendant acted, and all the other facts and circumstances shown by the evidence that may prove what was in the defendant's mind at that time.** It is entirely up to you to decide what the evidence presented during this trial proves, or fails to prove, about the defendant's state of mind.

It is critically important that the jury understand what the defendant did, how he acted and why he acted in the context of the training and the policies and procedures that

13

governed his job as a canine handler.  The expert can and will properly state the rules applicable to the canine handler as set forth in the policy and procedure manual and the particular facts showing what defendant "did, … failed to do and how the defendant acted".

> This jury will likewise be instructed on the definition of "willfully":

> The offense of deprivation of civil rights requires the Government to prove that the defendant acted "willfully" with respect to the element of depriving David Connor Castellani's rights guaranteed by the Constitutions or laws of the United States.  This means that the Government must prove beyond a reasonable doubt **that defendant knew that his conduct was unlawful and intended to do something that the law forbids.  That is, to find the defendant acted "willfully" you must find that the evidence presented at trial proved beyond a reasonable doubt that defendant acted with a purpose to disobey or disregard the law**.  …

A jury's understanding on the defendant's training, as well as the defendant's meticulous compliance with rules and regulations controlling his job as a canine handler are precisely applicable to a jury's determination on how the defendant acted, and more precisely whether defendant's actions evidence a "purpose to disobey or disregard the law".  Defendant was duty-bound to follow the law as it was placed upon him by the canine policy and procedure rules in effect at the time of Castellani's arrest.

In determining a deprivation of civil rights, the jury will likewise be instructed that the assessment of force must be viewed from the police officer's perspective.  In this regard, the particular rules, obligations and responsibilities of a canine handler are critically important:

> If you determine that the defendant used physical force against the victim, you must then decide whether that force was reasonable.  You should make **this determination considering all the facts and circumstances from the point of view of an ordinary and reasonable officer on the scene**. In making your determination, you may consider …

It is therefore necessary for a petit jury to understand what the ordinary and reasonable canine handler should and should not do and further, what that ordinary and reasonable canine officer is trained to do when confronted with split-second decisions on whether to deploy a canine.   In essence, an expert's testimony on the rules and regulations governing a canine handler form but a subset of issues as to whether the officer followed and complied with accepted police procedure as he was taught and instructed.   That is evidence that the defendant is entitled to admit as simply a part or segment of the jury's determination as to overall reasonableness.   And while it is ultimately the jury's determination as to whether the Government proves that Wheaten's conduct was unreasonable under the Fourth Amendment standard, the officer's compliance with mandated and objective rules and regulations is but a component part of the jury's overall reasonableness assessment.

Respectfully submitted,

Jacobs & Barbone, PA

/s/ Louis M. Barbone

Biancamano Law, LLC

/s/ Stacy A. Biancamaco

Dated: 10/4/21

15

EXHIBIT A

JMR (AD)/2014R00187

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 18-608 (RMB) |
| v. | : | |
| STERLING WHEATEN | : | 18 U.S.C. §§ 242, 1519 and 2 |

## INDICTMENT

The Grand Jury in and for the District of New Jersey, sitting at Camden, charges:

## COUNT 1
### [18 U.S.C. § 242 – Deprivation of Rights Under Color of Law]

Background

1.     At all times relevant to this Indictment:

a.     The Atlantic City Police Department ("ACPD") was a duly constituted police agency responsible for providing law enforcement services to serve and protect the community of Atlantic City, New Jersey.   ACPD Officers were authorized by the State of New Jersey to make lawful arrests.

b.     ACPD Officers who were selected to serve as K-9 officers attended the Atlantic County Police Training Center, also known as the John "Sonny" Burke Police K-9 Academy ("K-9 Academy").   The K-9 Academy has trained patrol and scent detection teams for over twenty-five years.   Officers and their K-9 partners were instructed in the areas of K-9 patrol and scent detection.   The K-9 patrol course covered all aspects of the patrol dog/handler

1

team instruction.   Subject matter included obedience, agility, criminal apprehension, scent work and socialization.

### The Defendant and Other Individuals and Entities

   c. Defendant STERLING WHEATEN was a resident of Margate, New Jersey.   On or about August 30, 2007, defendant WHEATEN was sworn in as an ACPD Officer.   On or about May 3, 2013, defendant WHEATEN graduated from the K-9 Academy with a certified Patrol K-9 "Hagan."

   d. Hagan was a police dog in the service of the ACPD assigned to assist defendant STERLING WHEATEN.

   e. Victim #1 was a 20-year-old-male who resided in Linwood, New Jersey.

   f. Tropicana Hotel and Casino ("Tropicana") was located at Brighton and The Boardwalk in Atlantic City, New Jersey.

   g. ACPD Officers #1 through #5 were other ACPD Officers who participated in the apprehension of Victim #1 outside the Tropicana.

### The Offense

  2. On June 15, 2013, defendant STERLING WHEATEN was working in his official capacity as an ACPD Officer with his K-9 partner, Hagan, and was assigned to the city under Unit designation K9-2 or K2.

  3. On June 15, 2013, after several ACPD Officers told Victim #1 to leave the area of the Tropicana, Victim #1 walked across Morris Avenue and began yelling threats and obscenities at the police officers.

2

4.     After several minutes, ACPD Officer #1 decided to arrest Victim #1 and ran across the street toward him.

5.     While ACPD Officer #1 and other officers attempted to grab Victim #1, Victim #1 pulled away and grabbed ACPD Officer #1 around the waist as Victim #1 was taken to the ground.

6.     During the struggle, ACPD Officer #1 fell to the ground with Victim #1 on top of him.   Three ACPD Officers, Officers #2 through #4, pulled Victim #1 from on top of ACPD Officer #1.   The four officers then delivered knee strikes to Victim #1's shoulder and back, punches to Victim #1's back, and baton strikes to Victim #1's back and legs.   Eventually, ACPD Officer #5 arrived and delivered two knee strikes to Victim #1 before successfully handcuffing Victim #1's left hand.

7.     During the struggle, which lasted less than 2 minutes, ACPD Officers requested, via police radio, the assistance of a K-9 Officer.   Defendant STERLING WHEATEN and his K-9 partner Hagan responded to the radio call.

8.     When defendant STERLING WHEATEN arrived, Victim #1 was laying on his stomach with ACPD Officer #1 kneeling on Victim #1's head/neck area and several ACPD Officers were pressing on Victim #1's back and legs.   At the time, ACPD Officer #5 had already placed one handcuff on Victim #1.

9.     Defendant STERLING WHEATEN immediately took his K-9 partner Hagan out of the vehicle and ran directly at Victim #1 and the five ACPD Officers.

3

10.     Upon seeing defendant STERLING WHEATEN and his K-9 partner Hagan approach, ACPD Officer #5 got off of Victim #1 while still holding the handcuff, which caused Victim #1's chest to be exposed to K-9 Hagan. Without issuing a warning that he would deploy the dog, or allowing Victim #1 a chance to surrender, defendant STERLING WHEATEN deployed/released K-9 Hagan and K-9 Hagan bit Victim #1 in the chest.

11.     Victim #1 pushed K-9 Hagan off of his chest and rolled to his side. K-9 Hagan re-engaged Victim #1 and bit him on the back of his neck. Defendant STERLING WHEATEN did not immediately remove K-9 Hagan from the back of Victim #1 neck, but instead told K-9 Hagan to "hold" on Victim #1's neck.

12.     During his training at the K-9 Academy, defendant STERLING WHEATEN was trained that the only type of K-9 apprehension that has resulted in the death of a suspect occurred when a K-9 bit a suspect on his neck and even though the K-9 was immediately recalled and medical care given, the suspect died.

13.     While K-9 Hagan was biting the back of Victim #1's neck, defendant STERLING WHEATEN punched Victim #1 twice in the shoulder/neck area.

14.     Eventually, Victim #1 was handcuffed and K-9 Hagan was placed into the police vehicle.

4

15.    ACPD Officer #6 administered first aid to Victim #1's head and neck until paramedics arrived.   Ultimately, Victim #1 was taken to AtlanticCare Regional Medical Center in Atlantic City, New Jersey in police custody where he was treated for dog bites to his head, neck and chest.

16.    After Victim #1 was transported to the hospital, defendant STERLING WHEATEN and ACPD Officers #1 through #5, returned to the police station to prepare their reports.

17.    Prior to writing the reports, ACPD Officer #1 obtained Tropicana's surveillance video of the assault.   Defendant STERLING WHEATEN met with ACPD Officers #1 through #4 and they watched the security video from the Tropicana before preparing their police reports.

18.    To justify his actions against Victim #1, defendant STERLING WHEATEN prepared and submitted false and fraudulent police reports.

The Charge

19.    On or about June 15, 2013, in Atlantic County, in the District of New Jersey, and elsewhere, defendant

STERLING WHEATEN

while acting under color of the laws of the State of New Jersey, and aiding and abetting persons both known and unknown to the grand jury, caused a police dog to attack Victim #1 and punched Victim #1 while the police dog was attached to Victim #1, and thereby willfully deprived Victim #1 of a right secured and protected by the Constitution and laws of the United States, that

5

is, the right to be free from unreasonable seizure by one acting under color of law, which includes the right to be free from the use of unreasonable force. The offense resulted in bodily injury to Victim #1.

In violation of Title 18, United States Code, Section 242, and Title 18, United States Code, Section 2.

6

<u>**COUNT 2**</u>
**[18 U.S.C. § 1519 – Falsification Of Records In A Federal Investigation]**

1.      Paragraphs 1 through 18 of Count 1 of this Indictment are incorporated as if set forth in full herein.

2.      The use of excessive force by a person acting under color of law, statute, ordinance, or regulation is a matter within the jurisdiction of the Federal Bureau of Investigation ("FBI"), which is an agency within the United States Department of Justice.

3.      On or about June 15, 2013, defendant STERLING WHEATEN wrote a false Supplemental Police report to falsely justify the force used against Victim #1 and to obstruct any investigation into the deprivation of Victim #1's right to be free from unreasonable seizure by one acting under the color of law, which includes the right to be free from the use of unreasonable force.

a.      As part of that report, defendant STERLING WHEATEN falsely stated, among other things, that Victim #1 was "fighting my K9 partner," "[struck] my partner with his right hand," "a further violent struggle ensued," and, in an effort to falsely justify the utilization of the K-9, that the "suspect violently assaulted uniformed law enforcement officer[s] with hands and fists . . . ."

b.      As part of the report, defendant STERLING WHEATEN, in an effort to falsely justify the closed fist punches to Victim #1, falsely stated that

7

he feared that Victim #1 "was going to get up and retrieve his weapon to injure us or flee the area endangering the public."

       c.     As part of the report, defendant STERLING WHEATEN falsely stated that he provided first aid to Victim #1's wound until the ambulance/EMT arrived.

      4.     On or about June 15, 2013, in Atlantic County, in the District of New Jersey, and elsewhere, defendant

STERLING WHEATEN

while acting in relation to and in contemplation of a matter within the jurisdiction of the FBI, an agency of the United States, knowingly falsified, concealed, covered up and made false entries in a document with the intent to impede, obstruct, and influence the investigation and proper administration of that matter, that is, defendant authored and submitted a false and misleading official incident report, in order to create a false justification for the assault of Victim #1, with intent to obstruct any investigation into the deprivation of Constitutional Rights described in Count 1.

     In violation of Title 18, United States Code, Section 1519, and Title 18, United States Code, Section 2.

8

A TRUE BILL

FOREPERSON

*Craig Carpenito*

CRAIG CARPENITO
United States Attorney

9

CASE NUMBER: 18-

United States District Court
District of New Jersey

UNITED STATES OF AMERICA

v.

STERLING WHEATEN

INDICTMENT FOR
18 U.S.C. § 242
18 U.S.C. § 1519
18 U.S.C. § 2

A True Bill.

_____
Foreperson

CRAIG CARPENITO
U.S. Attorney
Newark, New Jersey

JASON M. RICHARDSON
Assistant U.S. Attorney
Camden, New Jersey
(856) 757-5026

USA-48AD8
(Ed. 1/97)

EXHIBIT B

# ATLANTIC CITY POLICE DEPARTMENT

| VOLUME: 3 | CHAPTER: 17 | # OF PAGES: 40 |
|---|---|---|

**SUBJECT: K9 POLICY & PROCEDURES**

| EFFECTIVE DATE:<br>July 29, 2011 | | ACCREDITATION STANDARDS:<br>84.1.4 | REVISION DATE<br>03/20/12 | PAGE #<br>33 |
|---|---|---|---|---|
| UNDER THE AUTHORITY OF:<br>William R. Glass, Director of Public Safety | | | | |
| SIGNATURE: | DATE: | | | |
| BY THE ORDER OF:<br>Ernest C. Jubilee, Chief of Police | | | | |
| SIGNATURE: | DATE: | | | |
| SUPERSEDES ORDER #:<br>G.O. 11 of 1995 Use of Narcotic Training Aids for K-9's, G.O. 1 of 2010 K9 Policy & Procedures, and all other previously issued conflicting orders | | | | |

**PURPOSE:** The purpose of this policy is to provide for the positive and efficient utilization of the Department's K-9 Teams in a manner that will be most effective in attaining the law enforcement goal to serve and protect the community. The policy is also intended to direct and guide a K-9 officer's decision-making process in the appropriate use and handling of police K-9s. The use of a Police K-9 Team is a legitimate tool in attaining the goals of law enforcement in our society and plays a vital role in the everyday operation of police agencies nationwide. A K-9 Team's greatest value lies in the deterrent effect of their presence or the knowledge that the K-9 Team may arrive at any time.

**POLICY:** The use of a K-9 Patrol Team in making an apprehension or effecting or maintaining an arrest, constitutes the use of force or the implied use of force. It is therefore, imperative that the K-9 Officer is fully cognizant of all the facts and circumstances available surrounding the situation before a decision is made to use a Police Dog for anything other than deterrent patrol. It is recognized that Police K-9s have extraordinary scenting abilities and are often utilized as a searching tool.

**PROCEDURES:**

**I.      MISSION**

    A.     The primary mission of the K-9 Unit is to provide the trained K-9 Teams to assist in the following areas:

          1.     Prevention and detection of crime;

          2.     Protection of police officers and others;

          3.     Locating persons sought by law enforcement officials;

          4.     Locating criminal evidence or contraband and the detection of narcotic, explosives, arson accelerants, cadavers or persons in need of being rescued;

          5.     Such other duties as may be directed by competent authority and consistent with department policy and procedure.

    B.     All members of the department shall be trained on this K-9 Policy and shall cooperate and assist the K-9 Unit in achieving the goals and objectives as detailed in the policy.

    C.     Immediate supervision of K-9 Patrol Team when working in Patrol Operations shall be the responsibility of the Department's Patrol Supervisor.

    D.     Immediate supervision of K-9 Specialty Teams when handling a call for service shall be the responsibility of the Department's supervisor.

    E.     A Supervisor shall respond to the scene of all K-9 apprehensions/bites.

    F.     All members of the Police Department shall familiarize themselves with the capabilities and attributes of the Police K-9's operation within this department.

    G.     The K-9 Officer's assignment to the K-9 Unit shall in no manner relieve them from conforming to and complying with other orders of this department or general provisions of the department's Rules and Regulations.

**II.     DEFINITIONS**

    A.     K-9 Team is comprised of the Police Officer Handler and the Police Dog.

    B.     K-9 Patrol Team consists of a Police Office Handler and Police  Dog used in law enforcement for routine patrol work, such as: building/structure searches, filed/open area searches, wooded area searches, swamp/marsh searches, and article searches, tracking, criminal apprehension, etc.

    C.     K-9 Specialty Team consists of a Police Officer Handler and Police Dog used in law enforcement specifically for scent work, detection or tracking work. Specialty Teams are used for narcotic detection, arson accelerant detection, explosive detection, tracking, article or evidence searches and cadaver detection/search and rescue detection.

    D.     K-9 Officer/Handler is a law enforcement officer who officially utilizes a Police Dog in the course of assigned duties and responsibilities.

E.   Police Dog/K-9 is a dog that has been trained by a supervising K-9 trainer or K-9 trainer and is handled by a police officer handler in the performance of their duties, used for law enforcement purposes or any law enforcement related activities.

F.   Police Patrol Dog/K-9 is a police dog used for routine patrol work in law enforcement, such as: building/structure searches, field/open area searches, wooded area searches, swamp/marsh searches and article searches, tracking, criminal apprehension, etc.

G.   Police Specialty Dog/K-9 is a police dog used specifically for specialty work or specialized scent work such as detection and tracking in law enforcement that is narcotic detection, arson accelerant detection, explosive detection, tracking, article or evidence searches and cadaver detection/search and rescue detection.

H.   K-9 Unit Commander is the K-9 Unit Supervisor responsible for overall and day to day operations of the K-9 Unit as the Unit Commander.

I.   K-9 Trainer is qualified to conduct basic and in-service training for K-9 teams and must meet the requirements set forth in the K-9 Training Standards and Qualification Requirements for New Jersey Law Enforcement and the Atlantic County K-9 Policy.

K.   Supervising K-9 Trainer conducts the basic in-service K-9 training and qualifying exercises. They are responsible for supervising K-9 handlers who assist with any K-9 training, and for certifying qualified prospective handlers and K-9 trainers. Supervising K-9 trainers must meet the requirements set forth in the K-9 Training Standards and Qualification Requirements for New Jersey Law Enforcement and the Atlantic County K-9 Policy.

## III.   SELECTION CRITERIA FOR K-9 PERSONNEL

A.   It is recognized that proper selection of handler and K-9, quality basic and in-service training, and a commitment by all members of the K-9 Unit are essential for a successful Police Dog Program.

B.   In order to be considered for appointment to the K-9 Unit, the officer seeking such appointment shall:

1.   Have a minimum of three (3) years of full time sworn service with the Atlantic City Police Department.

2.   Be prepared, if selected, to commit to a K-9 service appointment for an extended period of time, generally lasting the working life of the K-9.

3.   Be prepared, if selected, to provide the proper care for their K-9 at all times.

4.   Have a willingness to adopt and care for their K-9 upon the retirement of the K-9 or at the completion of the K-9 assignment.

5.   Have written recommendations by the supervisor and if required, other officials, recommending them for a K-9 assignment. Have their sick, injury and suspension time, as well as their Internal Affairs file reviewed.

6. Be self motivated, energetic, resourceful and alert, as well as clearly demonstrating a positive attitude in regards to their work ethics and job performance.

7. Have demonstrated throughout their career unquestioned integrity and sensitivity to the residents of the community.

8. Satisfactory completion of a psychological evaluation.

9. Satisfactory completion of a physical evaluation.

10. Satisfactory completion of an interview with the K-9 Unit Supervisor, as well as any other officials necessary.

## IV. REQUESTS FOR USE OF K-9 SERVICES

A. <u>Use Within Atlantic City</u>

1. Requests for the immediate tactical utilization of the services of the K-9 Unit in accordance with the guidelines of this Policy may be made by a supervisor, or in the absence of a supervisor, by any police officer at the scene of an incident.

2. Such request shall be made to the police radio dispatcher who shall direct that K-9 assistance to be dispatched. A patrol supervisor shall be immediately notified to respond to the location of the requested deployment.

3. If a request arises for K-9 assistance and no K-9 team is on duty, the police radio dispatcher shall notify the Shift Commander or their designee, and they shall determine, depending upon the circumstances, whether or not to call in a department K-9 team or request the assistance of a K-9 team from another jurisdiction to handle the assignment

4. Upon arrival of the K-9 Officer at the scene, they shall be responsible for determining whether or not the circumstances of the incident justify the use of a K-9 and for determining the tactical utilization of the same.

5. If possible, the K-9 Officer shall provide the on-scene or responding supervisor with the sufficient information regarding the proposed use of the K-9 and a decision shall be made whether or not the deploy the K-9.

6. The K-9 Officer shall always retain the authority to refuse to deploy their K-9 if they believe that the use of the K-9 is unjustified, tactically unfeasible, the K-9 is not suited for the particular assignment or the conditions are unsafe.

7. If special circumstances surround the request for K-9 support, if necessary, the K-9 Unit Supervisor shall be advised of the request for assistance and dispatch of the K-9 Team(s). A patrol supervisor shall respond to the scene.

8. If necessary, a K-9 Unit Supervisor, Supervising K-9 Trainer or Training Unit Commander may be requested to respond scene, upon approval of the Shift Commander.

9. At the conclusion of the assignment, the K-9 officer and if necessary, assisting officers, shall submit reports regarding the incident as outlined in the Policy.

10.     If the need arises for K-9 assistance and no K-9 team is on duty, the Shift Commander or their designate, shall request approval from the Chief of Police or designate before calling an off-duty K-9 Team to handle the assignment.

B.     Use Outside Atlantic City

1.     All requests for dispatch of K-9 Unit personnel for use in areas outside of Atlantic City shall be directed to the Shift Commander or their designee.

2.     All such requests shall be afforded immediate and careful consideration, and when in the opinion of the Shift Commander or their designee, the services can be provided from the resources available and the need appears to justify the use of a K-9, then such request shall be approved and the following actions taken:

   a.     Advise the responding K-9 Team of the nature of the request and the circumstances surrounding the particular incident and direct the K-9 Team to respond to the requesting agency.

   b.     Advise the requesting agency of the decision concerning the requests for special K-9 support and the approximate time the K-9 will arrive at the designated area the furnish the requested assistance.

   c.     An on-duty supervisor shall respond to the scene along with the K-9 Team.

   d.     If necessary, have additional officers respond as back for the K-9 Team.

   e.     If special circumstances surround the request for K-9 support, advise the K-9 Unit Supervisor of the request for assistance and the dispatch of the K-9 Team(s), if necessary, the K-9 Unit Supervisor shall respond to the scene.

   f.     Upon arrival of the requesting jurisdiction, the K-9 service shall handle the assignment in a manner consistent with this K-9 policy.

   g.     If a supervisor is present at the scene, if possible, the K-9 officer shall provide the supervisor with sufficient information regarding the proposed use of the K-9 and a decision shall be made whether or not to deploy the K-9.

   h.     The K-9 officer shall always retain the authority to refuse to deploy their K-9 if they believe the use of the K-9 is unjustified, tactically unfeasible, the K-9 is not suited for the particular assignment or the conditions are unsafe.

   i.     Throughout the assignment, the K-9 officer and assisting officers shall ensure that they have radio contact with the agency they are assisting, and provide status updates to own police radio dispatcher.

   j.     At the conclusion of the assignment, the K-9 officer and if necessary, assisting officers shall submit reports regarding the incident as outlined in the Policy.

k.  If a request arises from another agency for K-9 assistance and no K-9 team is on duty, the police radio dispatcher shall notify the Shift Commander or designee, who shall grant approval before calling an off-duty K-9 Team in to handle the assignment.

## V.  USE OF FORCE GUIDELINES FOR K 9 OFFICERS

A.  This section is provided to guide a K-9 officer's decision making process in the deployment of a K-9 patrol team in situations necessitating the use of force to affect a lawful arrest.

B.  In situations where K-9 officers are justified in using force, the utmost restraint should be exercised. The use of force should never be considered routine. In determining to use force, the K-9 officer shall be guided by the principal that the degree of force employed in any situation should be only that which is reasonably necessary.

C.  K-9 officers should use only that amount of force that he or she, reasonably believes is immediately necessary. K-9 officers should exhaust all other reasonable means before resorting to the use of force. It is the policy of the State of New Jersey that K-9 officer will use only that force which is objectively reasonable and necessary.

D.  Deciding whether to utilize force when authorized in the conduct of official responsibilities is among the most critical decisions made by K-9 officers. It is a decision, which can be irrevocable. It is a decision which must be made quickly and under difficult, often unpredictable circumstances.

E.  Sound judgment and the appropriate exercise of discretion will always be the foundation of K-9 officer decision making in the broad range of possible use force situations. It is not possible to entirely replace judgment and discretion with detailed policy provisions.

F.  Nonetheless, our Use of Force Policy is intended to provide the best guidance and direction possible to K-9 officers when called upon to confront and address the most difficult of situations.

G.  K-9 officers, whose actions are consistent with the law and the provisions of our Use of Force and K9 policies, will be strongly supported by the law enforcement community in subsequent review of their conduct regarding the use of force.

H.  A police K-9 is the only law enforcement tool which can be recalled after deployment. In most situations, where the K-9 officer has commanded their police K-9 to make physical apprehension, that K-9 officer has the ability to recall the patrol dog if such circumstances arise, thereby terminating the apprehension command.

I.  Unlike the discharge of a firearm, which can never be recalled once fired, this unique ability affords added protection to all persons involved in the potentially dangerous of effectuating a lawful arrest. A police K-9 is the only law enforcement tool which, if taken away from you by a suspect, cannot be used against you.

J.  When a police patrol dog is deployed as a locating tool, using their extraordinary olfactory skills, the use of force at the time the suspect is located may or may not be necessary or mandated.

K.    It is recognized that a suspect who is actively resisting, fleeing or hiding creates a potentially dangerous situation for police officers.  Police officers are at a strategic disadvantage when pursuing a fleeing suspect or attempting to locate a suspect that hiding since it is usually unknown if the suspect is or has become armed, and it is usually unknown if the suspect plan to inflict harm upon the Police Officers and/ or the public.

L.    A K-9 officer may use physical force or mechanical (K-9) force when they **reasonably believe it is immediately necessary** at the time to:

1.    Overcome resistance directed at the officer or others; or

2.    Protect the officer, or third party, from unlawful force; or

3.    Protect property; or

4.    Effect other lawful objectives, such as to make an arrest.

M.    Four Factors for Deployment

1.    Where use of mechanical force is justified to effect the arrest of a suspect **and** probable cause exists to believe that the suspect has committed an offense as defined in N.J.S.A. 2C:1-14, the K-9 may be directly used to apprehend the suspect.

2.    Taking into consideration the **totality of the circumstances**, using the information available to the officer(s) at the time of the incident, K-9 officers shall consider the following factors in determining whether to use a police dog to forcibly effect an apprehension:

a.    The severity of the crime under investigation; and

b.    Whether the suspect poses an immediate threat to the safety of the police or others nearby; and

c.    Whether the suspect is actively resisting arrest with force or violence; and

d.    Whether the suspect is attempting to evade arrest by flight.

3.    K-9 patrol teams should not be used to physically apprehend anyone suspected to be under the influence of drugs or alcohol, or the mentally disturbed, if no other offense is involved.

4.    Unless it would otherwise increase the risk of injury or escape, if possible, a clearly audible warning announcement that a police K-9 will be utilized shall become prior to utilizing the K-9.

5.    It is recognized that situations may arise that do not fall within the provisions set forth in this Policy. In any such case, a standard of **objective reasonableness** shall be used to review the decision to use a police K-9 in view of the **totality of the circumstances**

N.   Minor Offenses

1.   Use of the K-9 to stop the commission of, or apprehend a person believed to have committed, a minor offense, such as a disorderly persons offense, petty disorderly persons offense, ordinance violation or motor vehicle offense, would be inappropriate in the absence of violent or threatening conduct on the part of the offender that endangers the life or physical safety of the police or others.

## VI.   DEPLOYMENT AND USE OF POLICE K-9

A.   Building/Structure Searches:

1.   A K-9 patrol team may be utilized to conduct a building/structure search when it is believed that:

a.   unauthorized entry has been gained into a building or structure, or a suspect has fled into and concealed themselves in a building or structure, **and**

b.   **probable cause** exists to believe that a suspect hiding within the building or structure has committed or was presently committing an offense or crime as defined by the laws of the state of New Jersey, **and**

c.   K-9 officer **reasonably believes** the use of force is **immediately necessary** at the time to effectuate the arrest.

2.   The initial responding officers shall immediately establish a perimeter and exhaust all available efforts to determine if innocent persons, including police personnel, are contained within the established perimeter without entering the same.

3.   They shall also exhaust all available efforts to avoid any contamination of the area unless emergency situations dictate otherwise

4.   Whenever possible, the building/structure owner or their designate, should be contacted prior to the search to ascertain any other information that may be beneficial to the K-9 team.

5.   Whenever possible, the building or structure's heating and air conditioning systems should be shut down to assist the K-9 in the search.

6.   Upon entering the building or structure, the K-9 officer shall give the suspect an opportunity to surrender by delivering a loud and clear verbal warning announcement prior to beginning the search with the Police K-9.

7.   The warning announcement should be loud enough to be heard by not only the suspect, but also any back-up officers that may be stationed outside the building or structure and any innocent persons that may be inside.

8.   The warning announcement shall be as follows:

**"THIS IS THE POLICE.  YOU ARE UNDER ARREST.  I HAVE A TRAINED POLICE DOG.  MAKE YOURSELF KNOWN AND SURRENDER.  IF YOU DO NOT COMPLY, I WILL RELEASE HIM AND HE WILL FIND YOU AND BITE YOU."**

9.   After making the above warning announcement, the K-9 officer shall wait a reasonable amount of time, depending on the size of the building or structure, to allow the suspect to surrender and/or innocent persons to exit.

10.  The K-9 officers shall advise the police radio dispatcher when they are releasing their K-9 off lead to begin the search. The dispatcher shall then advise the officers on the scene of the release of the K-9.

11.  All radio transmissions shall be kept to a minimum while the K-9 team is conducting the search In large buildings or structures, or buildings or structures with multiple levels, as deemed necessary by the K-9 officer, while progressing through the search area.

12.  This is to ensure the suspect and/or innocent persons heard the warning announcement. If additional announcements are necessary, the K-9 officer shall secure their K-9 prior to making additional announcements.

13.  The search shall be conducted in a systematic manner as determined by the K-9 officer.

14.  All searches shall be conducted off lead, except, when in the opinion of the K-9 officer; the K-9 safety of others would be jeopardized. It shall be the K-9 officer's decision whether the search is conducted on or off-lead.

15.  It is the discretion of the K-9 officer whether or not to employ back up officers to assist in the search. If back-up officers are utilized, if possible, the K-9 officer shall provide the officers with detailed instructions prior to the search.

16.  The instructions shall include the officer's conduct around the K-9 team.

17.  In addition, the safety of the perimeter officers must be taken into consideration when conducting the search.  K-9 patrol teams should not be utilized to conduct vacant building/structure searches, unless a serious crime has taken place and any delay in the suspect's apprehension may pose a threat to public safety.

18.  These types of buildings/structures may be structurally unsafe and are frequently used by juveniles, transients and vagrants. Therefore, extra precaution shall be taken by the K-9 officer when conducting this type of search.

19.  It is recognized that there are times that it may become necessary for a K-9 officer to enter a vacant building/structure to handle a call for service.  In this instance, the K-9 officer may utilize their K-9 patrol dog on-lead for handler/officer protection.

20.     K-9 officers shall not be utilized in any freshly painted building/structure where paint fumes still linger, or where other potentially harmful conditions or substances exist.

21.     The K-9 officer shall advise those on scene when the search area appears to be clear.

22.     At no time shall a K-9 be deployed into an abandoned building for the sole purpose of locating a suspect who is merely trespassing. K-9 dogs can and will be deployed if a suspect(s) has entered and hidden themselves into an abandoned building after committing a criminal offense and any delay would pose a serious threat to public safety.

B.     <u>Open Area, Field, Wooded Area and Swamp/Marsh Searches</u>:

1.     A K-9 patrol team may be utilized to conduct an open area, field, wooded area or a swamp/marsh search when it is believed that a suspect has fled and/or is hiding in the above areas <u>and</u> probable cause exists to believe that the suspect within the area had committed or was presently committing an offense or crime as defined by the laws of the State of New Jersey, and the K-9 officer **reasonably believes** the use of force is **immediately necessary at** the time to effectuate the arrest.

2.     The initial responding officers shall immediately establish a perimeter and exhaust all available efforts to determine if innocent persons, including police personnel, are contained within the established perimeter without entering same. They shall also exhaust all available efforts to avoid any contamination of the area unless emergency situations dictate otherwise.

3.     Upon entering the search area, the K-9 officer shall give the suspect an opportunity to surrender by delivering a loud and clear verbal warning announcement prior to beginning the search with the police K-9. The warning announcement should be loud enough to be heard by not only the suspect, but also any back-up officers stationed outside the search area and by any innocent persons that may be inside the search area.

4.     The warning announcement shall be as follows:

**"THIS IS THE POLICE. YOU ARE UNDER ARREST. I HAVE A TRAINED POLICE DOG. MAKE YOURSELF KNOWN AND SURRENDER. IF YOU DO NOT COMPLY, I WILL RELEASE HIM AND HE WILL FIND YOU AND BITE YOU."**

5.     Where there is reasonable belief that the suspect speaks a language other than English, if possible, an officer or other individual fluent in that language shall be summoned to the scene to assist.

6.     After making the above warning announcement, the K-9 officer shall wait a reasonable amount of time, depending on the size of the search area, to allow the suspect to surrender and/or innocent persons to exit.

7.     The K-9 officer shall advise the police radio dispatcher when they are releasing their K-9 off lead to begin the search. The dispatcher shall then advise the officers on scene of the release of the K-9.

8.     All radio transmissions shall be kept at a minimum while the K-9 team is conducting the search.

9.     In large search areas, additional warning announcements should be made, as deemed necessary by the K-9 officer, while progressing through the search area. This is to ensure the suspect and/or innocent persons heard the warning announcements.

10.    If additional warning announcements are necessary, the K-9 officer shall secure their K-9 prior to making the additional warning announcements.

11.    The search shall be conducted in a systematic manner as determined by the K-9 officer.

12.    All searches shall be conducted off lead, except, when in the opinion of the K-9 officer; the K-9's safety or the safety of others would be jeopardized. It shall be the K-9 officer's decision whether the search is conducted on or off-lead.

13.    It is the discretion of the K-9 officer whether or not to employ back-up officers to assist in the search. If back-up officers are utilized, if possible, the K-9 officer shall provide the officers with detailed instructions prior to the search.

14.    The instructions shall include the officers' responsibilities during the search, as well as the officers' conduct around the K-9 team.

15.    The safety of the perimeter officers must be taken into consideration when conducting the search. Therefore, the K-9 officers shall advise officers securing the search perimeter, whether or not they should remain inside their vehicles or another secure area while the K-9 team is conducting an off-lead search.

16.    The K-9 officer shall advise those scene when the search area appears to be clear.

C.   Tracking:

1.     Tracks can be conducted by the K-9 teams for various situations including, but not limited to: missing persons such as the elderly, children, etc., or suspected offenders who may have entered, occupied, or fled from a particular location.

2.     The initial responding officers shall immediately establish a perimeter and exhaust all available efforts to determine if innocent persons, including police personnel, are contained within the established perimeter without entering the same.

3.     They shall also exhaust all available efforts to avoid any contamination of the area unless emergency situations dictate otherwise.

4.     Articles of clothing or other personal property of the person to be tracked shall be safeguarded from contamination to facilitate the track. Tracking shall be conducted on lead. The lead length shall be determined by the K-9 officer.

5.     Upon entering the search area, the K-9 officer shall give the suspect an opportunity to surrender by delivering a loud and clear verbal warning announcement prior to beginning the search with the police K-9; and as

deemed necessary by the K-9 officer, while progressing through the search area.

6. The warning announcement should be loud enough to be heard not only by the suspect, but also by any back-up officers stationed outside the search and any innocent persons that may be inside the search area.

7. The warning announcement shall be as follows:

   **"THIS IS THE POLICE.  YOU ARE UNDER ARREST.  I HAVE A TRAINED POLICE DOG.  MAKE YOURSELF KNOWN AND SURRENDER.  IF YOU DO NOT COMPLY, I WILL RELEASE HIM AND HE WILL FIND YOU AND BITE YOU."**

8. Where there is reasonable belief that the suspect speaks a language other than English, if possible, an officer or other individual fluent in that language shall be summoned to the scene to assist.

9. The K-9 officer shall advise the police radio dispatcher when they are beginning the track. The dispatcher shall then advise all on scene officers that the K-9 team is beginning the track.

10. All radio transmissions shall be kept to a minimum while the K-9 team is conducting the search.

11. It is the discretion of the K-9 officer whether or not to employ back-up officers to assist in the track.

12. If back-up officers are utilized, if possible, the K-9 officers shall provide the officers with detailed instructions prior to the search.

13. The instructions shall include the officers' responsibilities during the search, as well as the officers' conduct around the K-9 team.

14. In addition, the safety of the perimeter officers must be taken into consideration when conducting the search. When tracking a missing person, and/or utilizing their police K-9 solely as a locating tool.

15. K-9 officers shall be aware of the potential for their K-9 to make physical apprehensions and take the necessary precautionary measures, including making an audible announcement.

16. Where the use of a K-9 is deemed necessary and appropriate to track a missing persons, especially a child, the risk attendant to such a procedure shall first be explained by the K-9 officer, or a supervisor, to the missing person's parent or guardian.  The approval of the missing person or child's parent or guardian, must first be obtained before the K-9 team is deployed.

17. Prior consent need not be obtained where there is reason to believe an abduction has occurred or the child may be in danger without the immediate use of the K-9.

18. The K-9 officer shall advise those on the scene when the search area appears to be clear.

D.    Article or Evidence Searches:

1.    K-9 teams may be utilized to search for a variety of physical evidence and other related articles.

2.    The initial responding officers shall immediately establish a perimeter and exhaust all available efforts to determine if innocent persons, including police personnel, are contained within the established perimeter without entering the same.

3.    They shall also exhaust all available efforts to avoid any contamination of the area unless emergency situations dictate otherwise.

4.    The search shall be conducted in a systematic manner as determined by the K-9 officer.  It shall be the K-9 officer's decision whether the search is conducted on or off lead.

5.    The K-9 officer shall advise those on scene when the search area appears to be clear.  Under no circumstances shall a K-9 officer permit their K-9 to enter any area that the K-9 officer themselves would not be constitutionally permitted to enter.

6.    A K-9 may be utilized to search for, but not limited to the following in an article or evidence search:

1)    Controlled dangerous substances (narcotics), explosives, arson accelerants or cadavers/persons in need of being rescued;

2)    Instrumentalities of a crime, such as weapons, burglary tools, etc.;

3)    Fruits of a crime, such as stolen property, money, etc.;

4)    Articles of clothing or other personal property belonging to a victim or suspect;

5)    Any other item or article that may be used to solve a crime, locate a missing person, or render a particular area, building or structure unsafe.

E.    Criminal Suspect Apprehension:

1.    A K-9 team may be used to apprehend a suspect(s) when probable cause exists to believe that a suspect had committed or was presently committing an offense or crime as defined by the laws of the State of New Jersey, and the K-9 officer reasonably believes the use of force is immediately necessary at the time to effectuate the arrest.

2.    While in most situations, criminal apprehension will be accomplished off lead. However, the K-9 officer may also, depending upon the circumstances, accomplish criminal apprehension while the K-9 is on-lead.

3.    Whenever possible, the K-9 officer shall give the suspect an opportunity to surrender by delivering a loud and clear audible warning prior to the release of the K-9 to make the apprehension.

4.     The warning announcement shall be as follows:

**"THIS IS THE POLICE.  YOU ARE UNDER ARREST.  STOP OR I WILL RELEASE MY POLICE DOG WHO WILL BITE YOU."**

5.     Where there is reasonable belief that the suspect speaks a language other than English, if possible, an officer or other individual fluent in that language shall be summoned to the scene to assist.

6.     If the suspect surrenders, the K-9 apprehension shall be terminated and the suspect shall be handcuffed and searched.

7.     If an apprehension is made by the K-9 and the suspect complies and submits to the arrest, the K-9 officer shall immediately command the K-9 to release the suspect and call the K-9 into the watch position.

8.     If an apprehension is made by the K-9 and the suspect offers resistance, the K-9 officer shall immediately order the suspect to stop fighting and/or resisting so the K-9 officer shall command the K-9 to release the suspect.

9.     Once the suspect then complies and submits to the arrest, the K-9 officer shall immediately command the K-9 to release the suspect and call the K-9 into a watch position.

10.    Under absolutely no circumstances, should any police personnel, other than the K-9 officer, interfere with the K-9 once the K-9 has been committed to make the apprehension, unless specifically directed by the K-9 officer.

11.    The K-9 officer shall then advise the suspect that if they attempt to assault the police officers and/or the K-9, or attempt to escape, they will again be apprehended by the K-9.

12.    If other officers are available, they shall be directed by the K-9 officer to handcuff and search the suspect with the K-9 remaining in a watch position with the K-9 officer.   If there are no other officers available, this may be accomplished by the K-9 officer who shall leave their K-9 in a watch position.

13.    Once the suspect is handcuffed and searched, the K-9 shall be placed on lead.

14.    The K-9 officer and/or assisting officers shall ensure that the suspect is provided with immediate medical attention as outlined in this Policy.

G.     Riots/Crowd Situations:

1.     As defined in 2C:33-1a, at the scene of riots, imminent riots or other unruly and tumultuous public disturbances K-9 patrol teams may be dispatched only upon the direction of the Chief of Police, his designate, or Shift Commander. The deployment and use of the K-9 team in this instance will be primarily for officer safety. An on-scene Supervisor will be responsible for making such a request.

2.     K-9 patrol teams may respond as back-up units to large crowds and disorderly persons who fail to disperse upon official order, as defined in 2C:33-1b, Disorderly Persons Offense.

3. K-9 officers shall take extra precaution if required to use their K-9 in large crowd situations in order to avoid an accidental bite

4. When practical, K-9s are to be short leashed in situations involving a large crowd.

5. **K-9 patrol teams are <u>not</u> to be deployed for the Petty Disorderly Offense of Disorderly Conduct, as defined in 2C:33-2, et seq., absent additional circumstances as outlined in this policy.**

6. <u>Under no circumstances</u>, shall K-9 Teams be used solely for crowd control and/or deterrent effects at the scene of peaceful demonstrations or assemblies.

7. No police K-9 Team shall be deployed at the scene of civil/public disturbance, <u>except</u> to respond to an emergent, life-threatening set of riotous circumstances, or unless the deployment or use of the K-9(s) is in response to a specific situation and has been expressly authorized by the Prosecutor, the Chief of Police or designate of this department.

8. If a civil/public disturbance develops during the course of or as a result of any authorized use of the K-9 Team, the team shall be immediately removed from the scene of the disturbance.

H. <u>K-9 Specialty Team Searches:</u>

1. When situations arise that require the special skills and abilities of K-9 Specialty Team, such as narcotic, explosive, arson accelerant, tracking or cadaver/search and rescue K-9 team, their deployment is authorized as outlined in the Policy.

2. <u>Under no circumstances</u> shall a K-9 officer permit their police K-9 to enter any area that the K-9 officers themselves, would not be constitutionally permitted to enter.

3. Requests for the dispatch of an Explosives Detection K-9 team shall be made by the Bomb Squad Commander or their designate, or to the K-9 Unit Supervisor.

4. The Bomb Squad Commander or their designate or the K-9 Unit Supervisor, must be notified whenever an Explosive Detection K-9 Team is being dispatched.

5. A Narcotic Detection K-9 Team may be used in accordance with the current law to:

   a. Assist in the search for narcotics during a search warrant;

   b. Obtain a search warrant by using the narcotic detection K-9 in support of probable cause;

   c. Search vehicles, buildings/structures, open areas, bags, etc., or any other articles deemed necessary.

I.      Community Relations:

1.      Public demonstrations conducted by the K-9 Unit are usually well accepted and offer an excellent opportunity for police personnel to relate and interact with the community on a positive note. Since the public acceptance and support of the K-9 Unit is essential to maintaining the professional integrity of the K-9 Unit and the Department as a whole, all requests for a K-9 demonstration shall be handled as follows:

   a.   All K-9 demonstration requests shall be directed to the Chief of Police, or Deputy Chief, charged with day-to-day responsibility, for review and approval.   Upon approval, the K-9 demonstration request shall be forwarded to the K-9 Unit Supervisor who shall coordinate the demonstration.

   b.   All reasonable efforts shall be made by K-9 Unit personnel to fulfill all demonstration requests approved by the Chief of Police.

   c.   Care shall be taken by all K-9 Offices that their appearance and presentation reflect a respectable and professional image on the Department.

   d.   K-9 Officers shall maintain complete control over their K-9 to ensure the utmost safety to the public.

   e.   Civilian contact with Department K-9 should be extremely limited and is at the discretion of the K-9 Unit Supervisor or a certified K-9 Trainer.

## VII.   PROCESSING ARRESTEE AND REPORTING PROCEDURES

A.   When a suspect(s) is arrested as a result of K-9 Team intervention, assisting officers shall handle the transportation and assist with the arrest processing procedure of the subject. This shall provide the K-9 Team with the opportunity to return to service without unnecessary delay.

B.   It is imperative that certain instances relating to a K-9 Team's utilization be properly documented by the K-9 Officer. Therefore, the K-9 Officer shall complete reports for, but not limited to the following:

   1.   Deterrent effect that a K-9 Team had on an incident;

   2.   Surrenders;

   3.   Apprehensions/bites;

   4.   K-9 Patrol Team SearchesK-9 Specialty Team Searches;

   5.   K-9 utilization outside of Atlantic City (Mutual Aid).

C.   All K-9 Officers shall keep a journal that documents all K-9 related activity, including but not limited to: searches, apprehensions, surrenders, other K-9 utilization, K-9 related training/schools/seminars, K-9 demonstrations U.S.P.C.A. or other organizations, certifications, veterinary visits, etc.

EXHIBIT C

# USE OF FORCE

Attorney General's Use of Force Policy

Issued April 1985
Revised June 2000

Preface

The provisions of this revised policy are a product of the collective efforts and judgment of the New Jersey Use of Force Advisory Committee. Throughout the deliberation process, each member of the committee worked conscientiously to reach a consensus in this area of critical importance to law enforcement officers and the citizens of this state. The New Jersey Use of Force Advisory Committee realized that the law alone could not achieve the goal of properly guiding the use of force by the police. The letter of the law needed to be supplemented with clear policy guidance designed to prepare officers to react appropriately when confronted with a use of force situation.

Policy

Sworn law enforcement officers have been granted the extraordinary authority to use force when necessary to accomplish lawful ends. That authority is grounded in the responsibility of every sworn law enforcement officer to comply with the laws of the State of New Jersey regarding the use of force and to comply with the provisions of this policy. Equally important is law enforcement's obligation to prepare individual officers in the best way possible to exercise that authority.

In situations where law enforcement officers are justified in using force, the utmost restraint should be exercised. The use of force should never be considered routine. In determining to use force, the law enforcement officer shall be guided by the principle that the degree of force employed in any situation should be only that reasonably necessary. Law enforcement officers should exhaust all other reasonable means before resorting to the use of force. It is the policy of the State of New Jersey that law enforcement officers will use only that force which is objectively reasonable and necessary.

This policy reinforces the responsibility of law enforcement officers to take those steps possible to prevent or stop the illegal or inappropriate use of force by other officers. Every law enforcement officer is expected and required to take appropriate action in any situation where that officer is clearly convinced that another officer is using force in violation of state law. Law enforcement officers are obligated to report all situations in which force is used illegally by anyone. This policy sends a clear message to law enforcement officers that they share an obligation beyond the requirements of

(6/00)

the law.  Officers are encouraged to do whatever they can to interrupt the flow of events before a fellow officer does something illegal and before any official action is necessary. Law enforcement officers can serve each other and the public by simply saying or doing the right thing to prevent a fellow officer from resorting to force illegally or inappropriately.

Deciding whether to utilize force when authorized in the conduct of official responsibilities is among the most critical decisions made by law enforcement officers. It is a decision which can be irrevocable.  It is a decision which must be made quickly and under difficult, often unpredictable and unique circumstances.  Sound judgment and the appropriate exercise of discretion will always be the foundation of police officer decisionmaking in the broad range of possible use of force situations.  It is not possible to entirely replace judgment and discretion with detailed policy provisions. Nonetheless, this policy is intended to provide the best guidance and direction possible to police officers throughout this state when called upon to confront and address the most difficult of situations.  Law enforcement officers whose actions are consistent with the law and the provisions of this policy will be strongly supported by the law enforcement community in any subsequent review of their conduct regarding the use of force.

## Definitions

A.   Constructive Authority

1.   Constructive authority does not involve actual physical contact with the subject, but involves the use of the law enforcement officer's authority to exert control over a subject.

2.   Examples include verbal commands, gestures, warnings, and unholstering a weapon.

3.   Pointing a firearm at a subject is an element of constructive authority to be used only in appropriate situations.

B.   Physical Contact

1.   Physical contact involves routine or procedural contact with a subject necessary to effectively accomplish a legitimate law enforcement objective.

2.   Examples include guiding a subject into a police vehicle, holding the subject's arm while transporting, handcuffing a subject and maneuvering or securing a subject for a frisk.

2

(6/00)

C.    Physical Force

1.    Physical force involves contact with a subject beyond that which is generally utilized to effect an arrest or other law enforcement objective.  Physical force is employed when necessary to overcome a subject's physical resistance to the exertion of the law enforcement officer's authority, or to protect persons or property.

2.    Examples include wrestling a resisting subject to the ground, using wrist locks or arm locks, striking with the hands or feet, or other similar methods of hand-to-hand confrontation.

D.    Mechanical Force

1.    Mechanical force involves the use of some device or substance, other than a firearm, to overcome a subject's resistance to the exertion of the law enforcement officer's authority.

2.    Examples include the use of a baton or other object, canine physical contact with a subject, or chemical or natural agent spraying.

E.    Deadly Force

1.    Deadly force is force which a law enforcement officer uses with the purpose of causing, or which the officer knows to create a substantial risk of causing, death or serious bodily harm.

2.    Purposely firing a firearm in the direction of another person or at a vehicle, building or structure in which another person is believed to be constitutes deadly force.

3.    A threat to cause death or serious bodily harm, by the production of a weapon or otherwise, so long as the officer's purpose is limited to creating an apprehension that deadly force will be used if necessary, does not constitute deadly force.

F.    Reasonable Belief

1.    Reasonable belief is an objective assessment based upon an evaluation of how a reasonable law enforcement officer with comparable training and experience would react to, or draw

Attorney General's Use of Force Policy

inferences from, the facts and circumstances confronting and known by the law enforcement officer at the scene.

G.   Imminent Danger

1.   Imminent danger describes threatened actions or outcomes that may occur during an encounter absent action by the law enforcement officer.  The period of time involved is dependent on the circumstances and facts evident in each situation and is not the same in all situations.

2.   The threatened harm does not have to be instantaneous, for example, imminent danger may be present even if a subject is not at that instant pointing a weapon at the law enforcement officer, but is carrying a weapon and running for cover.

H.   Substantial Risk

1.   Any discharge of a firearm entails some risk of an unintended outcome.   A substantial risk exists when a law enforcement officer disregards a foreseeable likelihood that innocent persons will be endangered.

2.   For example, firing a weapon into a confined space (room, vehicle, etc.) occupied by innocent persons exposes those persons to a substantial risk of harm.

I.   Law Enforcement Officer

1.   Any person sworn to enforce the criminal laws of the State of New Jersey, who is certified by the Police Training Commission, or is currently employed by a public safety agency and is authorized to carry a firearm under *N.J.S.A.* 2C:39-6.

I.   <u>Authorization and Limitations</u>

A.   Use of Force

1.   A law enforcement officer may use physical force or mechanical force when the officer reasonably believes it is immediately necessary at the time:

(6/00)



a.   to overcome resistance directed at the officer or others; *or*

b.   to protect the officer, or a third party, from unlawful force; *or*

c.   to protect property; *or*

d.   to effect other lawful objectives, such as to make an arrest.

B.   Use of Deadly Force

1.   A law enforcement officer may use deadly force when the officer reasonably believes such action is immediately necessary to protect the officer or another person from imminent danger of death or serious bodily harm.

2.   A law enforcement officer may use deadly force to prevent the escape of a fleeing suspect

a.   whom the officer has probable cause to believe has committed an offense in which the suspect caused or attempted to cause death or serious bodily harm; *and*

b.   who will pose an imminent danger of death or serious bodily harm should the escape succeed; *and*

c.   when the use of deadly force presents no substantial risk of injury to innocent persons.

3.   If feasible, a law enforcement officer should identify himself/herself and state his/her intention to shoot before using a firearm.

C.   Restrictions On The Use of Deadly Force

1.   A law enforcement officer is under no obligation to retreat or desist when resistance is encountered or threatened.  However, a law enforcement officer shall not resort to the use of deadly force if the officer reasonably believes that an alternative to the use of deadly force will avert or eliminate an imminent danger of death or serious bodily harm, and achieve the law enforcement purpose at no increased risk to the officer or another person.

2.   A law enforcement officer shall not use deadly force to subdue

(6/00)

persons whose actions are only destructive to property.

3.    Deadly force shall not be used against persons whose conduct is injurious only to themselves.

4.    Under current state statutes the discharge of any projectile from a firearm is considered to be deadly force, including less lethal means such as bean bag ammunition or rubber bullets.  For that reason, these and similar less lethal means of deadly force can only be used when an officer reasonably believes such action is immediately necessary to protect the officer or another person from imminent danger of death or serious bodily harm.

5.    A law enforcement officer shall not discharge a weapon as a signal for help or as a warning shot.

6.    While any discharge of a firearm entails some risk, discharging a firearm at or from a moving vehicle entails an even greater risk of death or serious injury to innocent persons.  The safety of innocent people is jeopardized when a fleeing suspect is disabled and loses control of his or her vehicle.  There is also a substantial risk of harm to occupants of the suspect vehicle who may not be involved, or involved to a lesser extent, in the actions which necessitated the use of deadly force.

    a.    Due to this greater  risk, and considering that firearms are not generally effective in bringing moving vehicles to a rapid halt, officers shall not fire from a moving vehicle, or at the driver or occupant of a moving vehicle unless the officer reasonably believes:

        (1)    there exists an imminent danger of death or serious bodily harm to the officer or another person; *and*

        (2)    no other means are available at that time to avert or eliminate the danger.

    b.    A law enforcement officer shall not fire a weapon solely to disable moving vehicles.

D.    Exhibiting a Firearm

1.    A law enforcement officer shall not unholster or exhibit a firearm

(6/00)

except under any of the following circumstances:

a.   For maintenance of the firearm;

b.   To secure the firearm;

c.   During training exercises, practice or qualification with the firearm;

d.   When circumstances create a reasonable belief that it may be necessary for the officer to use the firearm;

e.   When circumstances create a reasonable belief that display of a firearm as an element of constructive authority helps establish or maintain control in a potentially dangerous situation in an effort to discourage resistance and ensure officer safety.

II.   Training Requirements

A.   Every law enforcement agency is required to conduct and document semi-annual training for all officers on the lawful and appropriate use of force and deadly force.  This training must be designed to reflect current standards established by statutory and case law, as well as statewide, county and individual agency policy.  It should include but not necessarily be limited to the use of force in general, the use of physical and mechanical force, the use of deadly force, and the limitations that govern the use of force and  deadly force.

III.   Use of Force Reports

A.   In all instances when physical, mechanical or deadly force is used, each officer who has employed such force shall complete

1.   Any reports made necessary by the nature of the underlying incident; *and*

2.   Use of Force Report (Attachment A or agency required format)

IV.   Notifications and Reporting

A.   Immediate Notifications

(6/00)

Attorney General's Use of Force Policy
_____

    1.    County and municipal law enforcement agencies shall immediately notify the county prosecutor when the use of physical, mechanical or deadly force results in death or serious bodily injury, or when injury of any degree results from the use of a firearm by a law enforcement officer.

    2.    County prosecutor's offices shall immediately notify the Division of Criminal Justice when a member of their agency uses physical, mechanical or deadly force which results in death or serious bodily injury, or when injury of any degree results from the use of a firearm by agency personnel.

    3.    State law enforcement agencies shall immediately notify the Division of Criminal Justice when the use of physical, mechanical or deadly force results in death or serious bodily injury, or when injury of any degree results from the use of a firearm by a law enforcement officer.

B.    Reporting

    1.    County prosecutors shall within 24 hours report to the Division of Criminal Justice all situations where the use of deadly force by a law enforcement officer results in death or serious bodily injury, or in situations where any injury results from the use of a firearm by a law enforcement officer.

    2.    For all situations involving the use of physical, mechanical or deadly force, county and municipal law enforcement agencies shall report at least annually to the county prosecutor in a manner established by the prosecutor.

    3.    For all situations involving the use of physical, mechanical or deadly force, state law enforcement agencies shall report at least annually to the Division of Criminal Justice in a manner established by the Director of the Division of Criminal Justice.

(6/00)

8

Attachment A

Model Use of Force Report

_____ **POLICE DEPARTMENT**

**USE OF FORCE REPORT**

## A. Incident Information

| Date | Time | Day of Week | Location | INCIDENT NUMBER |
|------|------|-------------|----------|-----------------|
| | | | | |

Type of Incident
☐ Crime in progress   ☐ Domestic   ☐ Other dispute   ☐ Suspicious person   ☐ Traffic stop
☐ Other (specify)

## B. Officer Information

| Name (Last, First, Middle) | | Badge # | Sex | Race | Age | Injured Y / N | Killed Y / N |
|----------------------------|--|---------|-----|------|-----|--------------|--------------|
| Rank | Duty assignment | Years of service | | On-Duty Y / N | | Uniform Y / N | |

## C1. Subject 1  (List only the person who was the subject of the use of force by the officer listed in Section B.)

| Name (Last, First, Middle) | Sex | Race | Age | Weapon Y / N | Injured Y / N | Killed Y / N |
|----------------------------|-----|------|-----|--------------|---------------|--------------|
| ☐ Under the influence<br>☐ Other unusual condition (specify) | Arrested Y / N | | Charges | | | |

Subject's actions  (check all that apply)
☐ Resisted police officer control
☐ Physical threat/attack on officer or another
☐ Threatened/attacked officer or another with blunt object
☐ Threatened/attacked officer or another with knife/cutting object
☐ Threatened/attacked officer or another with motor vehicle
☐ Threatened officer or another with firearm
☐ Fired at officer or another
☐ Other (specify)

Officer's use of force toward this subject  (check all that apply)
☐ Compliance hold          Firearms Discharge
☐ Hands/fists              ☐ Intentional
☐ Kicks/feet               ☐ Accidental
☐ Chemical/natural agent
☐ Strike/use baton or other object   Number of Shots Fired ____
☐ Canine                   Number of Hits ____
☐ Other (specify)          [Use 'UNK' if unknown]

## C2. Subject 2  (List only the person who was the subject of the use of force by the officer listed in Section B.)

| Name (Last, First, Middle) | Sex | Race | Age | Weapon Y / N | Injured Y / N | Killed Y / N |
|----------------------------|-----|------|-----|--------------|---------------|--------------|
| ☐ Under the influence<br>☐ Other unusual condition (specify) | Arrested Y / N | | Charges | | | |

Subject's actions  (check all that apply)
☐ Resisted police officer control
☐ Physical threat/attack on officer or another
☐ Threatened/attacked officer or another with blunt object
☐ Threatened/attacked officer or another with knife/cutting object
☐ Threatened/attacked officer or another with motor vehicle
☐ Threatened officer or another with firearm
☐ Fired at officer or another
☐ Other (specify)

Officer's use of force toward this subject  (check all that apply)
☐ Compliance hold          Firearms Discharge
☐ Hands/fists              ☐ Intentional
☐ Kicks/feet               ☐ Accidental
☐ Chemical/natural agent
☐ Strike/use baton or other object   Number of Shots Fired ____
☐ Canine                   Number of Hits ____
☐ Other (specify)          [Use 'UNK' if unknown]

➤ **If this officer used force against more than two subjects in this incident, attach additional USE OF FORCE REPORTS.**

| Signature: | Date: |
|------------|-------|
| Print Supervisor Name: | Supervisor Signature: |

7/2001