UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | Hon. Renée Marie Bumb |
| v. | |
| STERLING WHEATEN | Criminal No. 18-608 (RMB) |

GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTIONS *IN LIMINE* TO ADMIT CERTAIN EVIDENCE

RACHAEL A. HONIG
Acting United States Attorney
U.S. Post Office and
Courthouse
401 Market Street, 4th Floor
Camden, New Jersey 08101
(856) 757-5026

On the Memorandum:

JASON M. RICHARDSON
R. DAVID WALK, Jr.
Assistant U.S. Attorneys
Camden, New Jersey

1

# TABLE OF CONTENTS

I.  FACTUAL AND PROCEDURAL STATEMENT ................................................. 1

II. THE PROFFER ................................................................................... 4

    A. Defendant Sterling Wheaten ................................................. 4

    B. The Proffer Statements Of Wheaten Are Admissible Against Him If: (A)
       The Defendant Should Take The Stand And Testify Inconsistently; Or (B)
       The Defendant Suggests Conclusions Or Inferences That Are Inconsistent
       With His Proffer Statement. ................................................. 9

IV. CONCLUSION ................................................................................ 16

i

## I.  FACTUAL AND PROCEDURAL STATEMENT

On the early morning of Saturday June 15, 2013, the Defendant, Sterling Wheaten deploying his K-9 partner during an arrest of Victim David Castellani, an intoxicated 20-year-old.  The incident occurred across the street from the Tropicana Casino in Atlantic City, New Jersey, and the casino's surveillance cameras recorded part of the interaction between the police and Castellani.

Prior to the arrest, Tropicana security guards had repeatedly escorted Castellani out of the casino because he had attempted to enter the establishment with an identification that stated that he was of legal drinking age when in reality he was 20 years old.  Castellani was barred from re-entering the property and ultimately given a citation for trespassing and told to leave.  Atlantic City Police Department ("ACPD") Officers Lorady, Scott Sendrick, Kevin Law, and Matthew Rodgers eventually arrived on the scene, and Castellani began arguing with the officers.  The surveillance video, which contains no audio, depicts Castellani standing across the street from the officers and repeatedly yelling and pointing in their direction.  The officers, led by Lorady, charge across the street at Castellani, and, after Lorady tackled Castellani and Castellani grabbed Lorady around the waist, all of parties end up on the ground with the officers on top of Castellani.  While on the ground, Castellani never struck or hit any of the officers.  Lorady, Sendrick and Law

repeatedly struck Castellani's body with their fists, knees and a baton. Eventually, Officer Avette Harper arrived on the scene to help arrest Castellani. According to the officers' police reports, they used this force because Castellani was resisting their efforts to handcuff him, but Harper took out his handcuffs and successfully handcuffed one of Castellani's arms.

The Tropicana video then shows the Defendant arriving at the scene in his ACPD K-9 sports utility vehicle ("SUV"). The Defendant immediately exited his vehicle and brought his K-9 partner out of the SUV. At this point, the other five officers were surrounding Castellani, who was face down on the ground. Lorady's knee was on top of Castellani's head and Harper's knee was on Castellani's back. As the Defendant and his K-9 approached, all of the officers except Lorady stepped away from Castellani. As Harper stepped over Castellani, Harper was still holding his handcuffs with Castellani's left hand attached which exposed Castellani's left chest area. The Defendant, without warning to Castellani, immediately engaged his dog, which bit Castellani on the left side of his chest. The dog hit Castellani so hard that Castellani rolled onto his back and pushed the dog off his chest. The dog then reengaged and bit Castellani's neck. The Defendant did not immediately disengage the dog from Castellani's neck even though he knew that such a bite could cause death or serious bodily injury. While the dog was still engaged, the Defendant punched Castellani multiple times in the head and shoulder region. Officer Desiree Perez, who arrived after the dog bites, applied pressure to Castellani's injuries

on the neck and head and stayed with Castellani until the EMTs arrived and took over.  As a result of the incident, Castellani sustained severe lacerations and bruising to his neck and head.  He received a substantial number of stitches and stated that he has lasting muscle damage in his upper shoulder.

On or about October 10, 2018, the federal Grand Jury sitting in Camden returned a two-count Indictment against Sterling Wheaten charging him with deprivation of rights under color of law, in violation of 18 U.S.C. § 242 and falsification of records in a federal investigation, in violation of 18 U.S.C. § 1519.   The case is currently set for trial on October 18, 2021.

The United States of America, by and through its undersigned attorney, respectfully submits this Memorandum of Law in Support of Its Motion in Limine to Admit Certain Evidence, seeking the admission of certain evidence (described herein) at the trial of this case.  The Government is seeking to admit the proffer statement of Wheaten should he take the stand and testify or if defense counsel, through cross examination, opening statement, or closing argument, intimates something inconsistent with the defendant's proffered statements.

By filing this motion, the Government seeks a pretrial ruling from the Court to inform all parties whether and to what extent certain evidence will be admitted at trial.

3

## II.  THE PROFFER

### A. DEFENDANT STERLING WHEATEN

On October 5, 2018, defendant Sterling Wheaten, along with his attorney, Louis M. Barbone, Esquire, met with members of the United States Attorney's Office and the FBI.  Prior to the meeting, the Government provided defendant Wheaten and his attorney with a Proffer Letter which set out the terms and conditions of the meeting.  See Exhibit 1, Wheaten's Proffer Agreement.  Defendant Wheaten and his counsel signed the proffer agreement on October 5, 2018.

In relevant part, the proffer agreement provided:

With respect to the interview of Sterling Wheaten ("your client") by representatives of the United States Attorney's Office for the District of New Jersey and the Federal Bureau of Investigation to be held on October 5, 2018, ("the interview"), the following terms and conditions apply:

1.  Should your client be prosecuted, no statements made by your client during the interview will be used against your client in the government's case-in-chief at trial or for purposes of sentencing, except as provided below.

*    *    *    *

4.  The government may use your client's statements and any information provided by your client to cross-examine your client and to rebut any evidence or arguments offered on your client's behalf.

*    *    *    *

I have received this letter from my attorney, Louis Barbone, Esquire. I have read it, and I understand it fully.  I hereby accept the terms and conditions set forth in the letter.  This constitutes

4

the full agreement between the parties regarding the Government's use of the statements I made and information I provided during the interview.

See Exhibit 1 (emphasis added).

Both defense counsel and defendant signed the proffer agreement, acknowledging that they read it, understood it and accepted it as the "full agreement between the parties regarding the government's use of the statements" made by the defendant during his meetings. Id. In addition, defense counsel and the defendant placed their initials next to paragraph 4 after it was explicitly explained to the defendant.

After signing the proffer agreement, defendant Wheaten made numerous admissions about his use of force during the arrest of David Castellani, including the use of his police K9 and the reason for the closed fist strikes he delivered while the K9 was biting Castellani's neck. See Exhibit 2, FBI Form-302, Proffer of Sterling Wheaten on 10/05/2018. By way of example, and by no means an exhaustive list of the admissions made by defendant Wheaten during the course of his proffer, Wheaten stated:

1.    Officer Wheaten said the use of a K9 is mechanical force. He agreed that it is equivalent to the use of a baton.

2.    Officer Wheaten was then asked about grading while in the K9 Academy. He said the grading on agility was either pass fail. The grading for book knowledge was graded on a percentage. Officer Wheaten did not recall exactly the graded needed to pass. He did not receive remedial training by the K9 instructors. Officer Wheaten said he did help

5

an unknown number, possibly a dozen, other K9 candidates during training.

3.      Officer Wheaten said a dog only follows the commands of its handler.

4.      Officer Wheaten was asked by AUSA Richardson if training was received regarding the use of a canine that resulted in a death. AUSA Richardson said he could not recall the name of the case. SA Elton stated <u>Robinette</u>.  Officer Wheaten stated <u>Robinette vs Barnes</u>. Officer Wheaten stated he was vaguely familiar with the case. He then said yes, they were instructed on a lot of case law.

5.      Regarding the use of a K9 and when asked about constructive authority, Officer Wheaten said you can't bring out a dog as constructive authority. A dog cannot be brought out at the scene to disperse a crowd as constructive authority. It is prohibited to deploy a dog for only a disorderly persons offense, a mentally ill person, and solely for destroying property. A dog cannot be deployed solely on an intoxicated individual, but if it leads to other things then a dog could possibly be deployed.

6.      Regarding the incident involving Castellani, Officer Wheaten recalled hearing there was a male resisting. He also recalled multiple officers calling for a K9. He remembered specifically the voice of Darrin Lorady. Officer Wheaten described Officer Lorady's voice tone as being scared from experience . . . . Officer Wheaten did not recall exactly what Officer Lorady said. Officer Wheaten was not sure who the multiple units, greater than two, asking for K9 were. He said it was not Officer Lorady. Officer Wheaten said the radio erupted. Officer Lorady said there was a disorderly male.

7.      As he was arriving, Officer Wheaten saw officers on the ground trying to put someone in custody. There was a lot of movement. He did not recall the number of officers.

8.      Officer Wheaten was asked about looking at the hands of an individual. He said it was a fair assessment that the hands can kill you.

9.     Officer Wheaten drove up and parked his vehicle. . . . He said the front windows of his vehicle were up. He was unsure if the back windows were up or down. He heard officers screaming, stop resisting, get your hands behind your back. He heard Castellani screaming, fuck you. Officer Wheaten said the screaming was loud, he could hear it from his vehicle.

10.     Officer Wheaten said he got out of his car and grabbed his partner. Leading up to getting out of the car at the scene, Wheaten said Officers had asked for a K9, there were verbal threats from Castellani, the officers were in uniform, and Castellani gave no regard to the officers' orders. Officer Wheaten heard Officer Lorady say watch his right hand, he's reaching. Officer Wheaten said this triggered him to believe Castellani was in possession of a weapon. Officer Wheaten could see Castellani's left hand, but could not see his right hand. At this time, Officer Wheaten could not recall the position of Castellani. Other officers were trying to subdue Castellani. The officers were on top and around him. At this point Officer Wheaten utilized his partner (K9) who apprehended Castellani on his left side rib cage. Officer Wheaten said he did not give warnings due to exigent circumstances. He did not believe that a warning would do anything, it was pointless, and it was immediately necessary to utilize his partner.

11.     As the dog bites Castellani, Castellani rolled over onto his back. Castellani brought both his open hands up and hit/struck/pushed the dog off, the dog yelped. Officer Wheaten said the K9 did not roll Castellani over. Castellani rolled himself over. When asked, Officer Wheaten said he thought Castellani was trying to injure Officer Wheaten's dog and continue to fight.

12.     The dog then pops off of Castellani and immediately reengages on the back of Castellani's neck.

13.     Officer Wheaten said he was familiar with the use of force and the zones. He said there is no zone system with K9 apprehensions. The dog is trained to bite anywhere he can.

14.     Officer Wheaten was asked if using a baton what zone would the genitals be. He believed it would be a red zone. He said the head

7

would be a red zone. When asked about the neck, he said red, probably as well.

15.    When asked, Officer Wheaten said he was familiar with a directed bite. He was asked if the first bite on Castellani was a directed bite, he said yes. He said the second bite to Castellani was not directed, it was more a reaction from the dog.

16.    Officer Wheaten was asked if he immediately took the dog off of Castellani's neck. He said no, because Castellani was still resisting arrest. The other officers and himself were telling Castellani to stop resisting. Castellani then got on all fours. Castellani, with his right hand was striking the dog, while Officer Wheaten was on Castellani's left side.

17.    Officer Wheaten was asked if he punched Castellani in the shoulder two times. He said yes, and that he punched Castellani more than two times. Officer Wheaten said he was trying to subdue Castellani, to get him to the ground, because he thought Castellani was trying to get up and get away. He wanted to stop Castellani from punching his K9. . . . Eventually Castellani goes back to his belly. Officer Wheaten said it was pretty wild, it was like fighting the hulk. Castellani had no regard for the officers or the dog.

18.    Officer Wheaten said he did not see a weapon on Castellani. He did not recall radio calls before he arrived on scene indicating a weapon. Officer Lorady said watch his right hand, he's reaching. Officer Wheaten took that to mean Castellani had a weapon.

19.    When Officer Wheaten arrived with his K9, he did not say anything to get the other officers to move out of the way. They know from the K9 familiarization training to get out of the way.

20.    Officer Wheaten was then asked about K9 surrenders during the six weeks before the Castellani incident. He said he did have K9 surrenders. He gave an example of an incident near Ventnor. There was a domestic violence matter with a male having a weapon. The male sees Officer Wheaten get out of the vehicle with his dog. Officer Wheaten gave warnings. The male followed Officer Wheaten's commands. He did not run away. Officer Wheaten was asked if he had surrenders after the Castellani incident. He said he believed he did, also before the incident.

Officer Wheaten said a K9 officer does not always have to bring his K9 partner out of the vehicle. The officer can give warnings and the dog is barking for surrenders.

### B. THE PROFFER STATEMENTS OF WHEATEN ARE ADMISSIBLE AGAINST HIM IF: (A) THE DEFENDANT SHOULD TAKE THE STAND AND TESTIFY INCONSISTENTLY; OR (B) THE DEFENDANT SUGGESTS CONCLUSIONS OR INFERENCES THAT ARE INCONSISTENT WITH HIS PROFFER STATEMENT.

Defendant Wheaten voluntarily entered into the proffer agreement referenced above.  Before the proffer session, the Assistant U.S. Attorney provided Wheaten and his counsel with the proffer agreement.  Prior to each proffer session, Wheaten's counsel had sufficient opportunity to explain the proffer agreement to him, and counsel indicated that he had done so.  Neither Wheaten nor his counsel expressed any hesitation about executing the proffer agreement and did not request the Government to make any alterations or amendments to it.  Finally, Wheaten executed the proffer agreements after acknowledging that he read the agreement, understood it, and accepted its terms and conditions.  See Exhibit 1 ("I have read [the proffer agreement], and I understand it fully.  I hereby accept the terms and conditions . . . .  This constitutes the full agreement . . . regarding the government's use of the statements I made and information I provided . . . .").[1]

---

[1] Wheaten's choice to meet with investigators and prosecutor was his own decision, made with the benefit of advice from experienced counsel. Apparently, Wheaten and his counsel believed, as most participants in proffer sessions do, that he would benefit from a proffer session.  For instance, the meeting provides defendants, targets, and subjects with an opportunity to provide their side of the story or to demonstrate remorse for the crime in an

Certainly, statements made by a prospective defendant to prosecutors in anticipation of a possible non-trial resolution of criminal charges are governed by Fed. R. Evid. 410.[2]  But for the restrictions imposed by the proffer agreement and Rule 410, Wheaten's statements to investigators would be fully admissible as admissions of an opposing party pursuant to Fed. R. Evid. 801(d)(2)(A).  Because Rule 410 is an exception to the general principle that all relevant evidence is admissible at trial, see Fed. R. Evid. 402, its limitations are "not to be read broadly," see United States v. Griffith, 385 F.3d 124, 126 (2d Cir. 2004) (narrowly construing 18 U.S.C. § 3153, which limits the admissibility of a defendant's statements to pretrial-services officer).  Moreover, the protections of Rule 410 can be waived by the defendant so long as the

---

effort to convince the United States not to prosecute them.  It also gives defendants an opportunity to convince the United States to enter into a cooperation agreement with them, thus enabling them to receive a reduced sentence for their cooperation.  See United States v. Gomez, 210 F. Supp. 2d 465, 475 (S.D.N.Y. 2002); United States v. Chaparro, 181 F. Supp. 2d 323, 334-35 (S.D.N.Y. 2002).

[2] That rule states, in pertinent part:

> . . . evidence of the following is not, in any . . .  criminal proceeding, admissible against the defendant who . . . was a participant in [] plea discussions:
> * * * *

> (4) any statement made in the course of plea discussions with an attorney for the prosecuting authority which do not result in a plea of guilty or which result in a plea of guilty later withdrawn.

Fed. R. Evid 410.

waiver is knowing and voluntary.  See United States v. Mezzanatto, 513 U.S. 196, 205 (1995); United States v. Hardwick, 544 F.3d 565, 569-70 (3d Cir. 2008); United States v. Mayfield, 361 Fed. Appx. 425, 431 (3d Cir. 2010).

In Hardwick, the Third Circuit Court of Appeals addressed the breadth of a waiver that the defendant is permitted to make.  See Hardwick, 544 F.3d at 569–70.  In Hardwick, the defendant Murray, who went to trial in the District of New Jersey before Judge Kugler, had signed a proffer agreement that provided that the Government would not use his statement in its case-in-chief, but would be able to use the statements to "rebut any evidence or arguments offered on [Murray's] behalf."  Judge Kugler permitted the Government to introduce Murray's proffer statements in the Government's rebuttal case because Murray breached the proffer agreement by "attempting to elicit contradictory evidence (i.e., that Murray had a lesser role in [the killings that formed part of the case] . . . through cross examination."  Id.  The Third Circuit affirmed Judge Kugler's admission of the proffer evidence.  The Third Circuit reached the same conclusion in Mayfield, affirming this Court's decision to allow testimony regarding the defendant's proffered statements after finding that the waiver of Rule 410 rights was knowing and voluntary and that the defendant "made a knowing strategic choice to trigger the waiver provision of the proffer agreement, allowing the prosecution to introduce the conflicting statements."  Mayfield, 361 Fed. Appx. at 431 n.9.

11

Here, Paragraph 4 of the proffer agreement constitutes a conditional waiver of Wheaten's privilege under Rule 410, which is triggered if he testifies or presents any evidence or argument, including implying facts by cross-examination, that are contrary to his proffer statement.  This is no different than the situation addressed by the Third Circuit in Hardwick or Mayfield.  See also United States v. Velez, 354 F.3d 190, 195 (2d Cir. 2004) (approving broad waiver similar to the one at issue here); accord, United States v. Rebbe, 314 F.3d 402, 407 (9th Cir. 2002); United States v. Krilich, 159 F.3d 1020, 1024-25 (7th Cir. 1998).  In the instant case, as in Hardwick and Mayfield, the proffer agreement itself establish the conditions under which the Government may use Wheaten's proffer statement against him.  The agreement permits the United States to present Wheaten's proffer statements to "rebut any evidence or arguments offered on [that Defendant's] behalf."  The proffer agreement places no restrictions on the United States' use of Wheaten's statements to cross-examine him, or to rebut any evidence of arguments offered on his behalf by counsel.

The federal courts have routinely enforced proffer agreements containing provisions permitting both impeachment and rebuttal by proffer statements.[3]

---

[3] See United States v. Dortch, 5 F.3d 1056, 1068-69 (7th Cir. 1993) (trial court properly permitted Government to use defendant's proffer statements to cross-examine defense witness after defense counsel elicited testimony contradicted by defendant's admissions in proffer session); United States v. Maynard, 232 F. Supp. 2d, 39-40 (E.D.N.Y. 2002) (same); see also United States v. Burch, 156

In addition to <u>Hardwick</u> and <u>Mayfield</u>, Judge Simandle addressed the issue presented here in <u>United States v. Ford</u>, 2005 U.S. Dist. LEXIS 8917, at *3 (D.N.J. May 11, 2005) (Simandle, J.).  There, the defendant moved to prevent the United States from admitting any evidence during its case-in-chief of the defendant's statements made pursuant to a proffer agreement containing the same operative language that appears in Wheaten's proffer agreements.  The defendant in <u>Ford</u> argued that "allowing the Government to introduce the proffer statement in its case-in-chief should defense counsel argue innocence or challenge the testimony of key witnesses goes so far as to effectuate a waiver of [d]efendant's Fifth and Sixth Amendment rights, which were not knowingly and intelligently waived."  <u>Id.</u> at *4.  But, after surveying the relevant case law, Judge Simandle rejected the defendant's narrow interpretation of Paragraph 4 of the proffer agreement, holding:

> [I]f factual innocence is implied through the defense's cross-examination of a Government witness, then Defendant may be presenting evidence inconsistent with his proffer statements, and such statements would become admissible to that extent, pursuant to [Paragraph] 4 of the Proffer Agreements.  *Obviously, any argument by counsel asserting such factual innocence would also trigger admissibility of the proffer statements, to the appropriate extent, under the Proffer Agreements.*  In other words, argument by defense counsel asserting factual innocence of the Defendant, or

———————————

F.3d 1315, 1321-22 (D.C. Cir. 1998) (extending the admissibility of defendant's statements made to Government agents during plea negotiations to the Government's case-in-chief, in addition to admission for impeachment and rebuttal purposes).

commenting upon factually exculpatory evidence, will waive the immunity protection of [Paragraph] 1 of the Proffer Agreement.

Id. at *16 (emphasis added).

"As with any contract, the language of the proffer binds the parties."

United States v. Griffin, 84 F.3d 912, 919 (7th Cir. 1996); Hardwick 544 F.3d at 570 ("a proffer agreement is a contract and its terms must be read to give effect to the parties' intent"). Therefore, this Court should decide, in advance of trial, to enforce the waiver provisions of the proffer agreement and admit Wheaten's proffer statements to rebut: (a) inconsistent arguments presented by defense counsel during opening and closing statements; (b) inconsistent evidence elicited during witness examinations; and (c) inconsistent testimony from Wheaten. Before introducing proffer statements, the Government will ask for a side-bar, at which it will inform the Court and counsel of the inconsistencies it seeks to remedy and the proffer information that it will be using. See Griffin, 84 F.3d at 920-24 (describing the district court's step by step procedure to avoid defense counsel's inadvertently opening door to use of proffer statements). The Government also respectfully urges the Court to direct counsel for Wheaten to preview potentially inconsistent testimony, cross-examination or argument with the Court, out of the presence of the jury, in order to avoid unintentionally triggering the use of Wheaten's proffer statements. Id. Before resting its case-in-chief, the Government will also ask for a colloquy out of the presence of the jury concerning defense counsel's

14

planned closing argument.  If counsel intends to make arguments inconsistent with the proffer during the closing argument, the Government will identify the inconsistencies and seek to introduce the proffered admissions into evidence in order to meet counsel's argument.  By these careful steps, the Government seeks to ensure that Wheaten will not stumble over the trip-wire of inconsistency with his proffer statements.

The central function of a criminal trial is to discover the truth.  See Portuondo v. Agard, 529 U.S. 61, 73 (2000); Nix v. Whiteside, 475 U.S. 157, 166 (1986) ("the very nature of a trial [i]s a search for truth").  "Enforcing proffer agreements . . . enhance[s] the integrity of the judicial truth-seeking function."  United States v. Chaparro, 181 F. Supp. 2d 232, 335 (S.D.N.Y. 2002).  To permit Wheaten's counsel to present evidence, make arguments, or conduct lines of cross-examination that are contrary to his client's proffer statements, without also permitting the jury to assess that evidence in light of Wheaten's proffer statements, would thwart this purpose, and be tantamount to allowing a Wheaten to perpetrate a fraud on the jury and the court.  See United States v. Gomez, 210 F. Supp. 2d 465, 476 (S.D.N.Y. 2002) ("it is difficult to conceive of a good faith basis for an argument by counsel that contradicts her client's own [proffer] statements made when the client had great incentive to tell the truth"); cf. New Jersey Rules of Professional Conduct 3.3, "Candor toward the Tribunal." ("A lawyer shall not knowingly . . . [m]ake a false statement of material fact or law to a tribunal.").  In this case, Wheaten

made admissions about his assault of David Castellani as alleged in the Indictment.  To further the Court's pursuit of truth, encourage plea bargaining as a course of judicial resolution, and avoid a fraud on the Court, Wheaten's proffer statements should be admissible against him to rebut any inconsistent testimony, evidence or arguments presented by, or on behalf of, him at trial. Accordingly, the Court should find the specific provisions of the proffer agreement enforceable.

## IV.  CONCLUSION

For all of the foregoing reasons, this Court should grant the Government's motions.

Respectfully submitted,

RACHAEL A. HONIG
Acting United States Attorney

JASON M. RICHARDSON
R. DAVID WALK, JR.
Assistant U.S. Attorneys

Dated:      October 7, 2021
            Camden, New Jersey

**CERTIFICATE OF SERVICE**

The undersigned certifies that on this day I caused to be served, via the Court's Electronic Filing System, a copy of the Government's Notice of Motion and Memorandum of Law in Support of Its Motion Indentation, on:

Stacy Ann Biancamano, Esquire          Louis M. Barbone, Esquire
Biancamano Law, LLC                     Jacobs & Barbone, P.A.
312 North Avenue East, Suite 7          1125 Pacific Avenue
Cranford, New Jersey 07016              Atlantic City, New Jersey 08401

Attorneys for Defendant Sterling Wheaten

_____
Jason M. Richardson
Assistant U.S. Attorney

Dated: October 7, 2021

17